62 Cal.App.4th 533 (1998)
In re the Marriage of CHRISTOPHER and DEBORAH COOPER CONDON.
CHRISTOPHER CONDON, Appellant,
v.
DEBORAH ANN COOPER, Respondent.
Docket No. B103574.
Court of Appeals of California, Second District, Division Seven.
March 23, 1998.
*535 COUNSEL
Christopher Condon, in pro. per. for Appellant.
Patrick DeCarolis, Jr., for Respondent.
OPINION
JOHNSON, Acting P.J.
This case tests the very outer limits of a legal principle the California Supreme Court first announced in 1996. That principle allows a spouse with primary physical custody of a child to move away unless the other spouse can demonstrate the move would be against the best interests of the child. (In re Marriage of Burgess (1996) 13 Cal.4th 25 [51 Cal. Rptr.2d 444, 913 P.2d 473].) In Burgess, the approved move was 40 miles  from Tehachapi to Lancaster and was within the state of California. Here, respondent argues Burgess applies to justify a move-away of some 8,000 miles  from this state and nation to another, and from this continent on one side of the Pacific Ocean to another continent on the other side of that vast body of water.
With some reluctance we conclude this court should not interfere at this late date with the trial court's carefully constructed order allowing this relocation of mother and children. However, we find the order is not guaranteed enforceability in the Australian courts in its present form and remand for the trial court to obtain an enforceable concession of jurisdiction *536 from respondent wife, a concession that party has volunteered to make. We also express our concerns about relocation orders of this dimension, even as we recognize they may be more frequently requested in future years as we move toward a global community.

FACTS AND PROCEEDINGS BELOW
Appellant, Christopher Condon, and respondent, Deborah Ann Cooper, were married on September 26, 1988, in Australia. Ms. Cooper is a native of Australia and Mr. Condon is an American citizen. Both of their sons, Bayard, born on February 5, 1989, and Henry, born in September 3, 1991, were born in Australia. But the family resided for several years in Los Angeles and the dissolution and child custody proceedings were decided in the California courts.
Ms. Cooper alleges numerous incidents of physical abuse throughout the marriage. Mr. Condon acknowledges he was arrested in November 1989, after pulling down Ms. Cooper's pants and spanking her following an argument. He was released with no charges filed. He testified he never struck or slapped his wife again after this incident. The trial court thought Ms. Cooper exaggerated the level of violence perpetrated by Mr. Condon against her, though the court believed there had been more than two occasions of physical violence against Ms. Cooper.
On or about July 8, 1993, Ms. Cooper, with the agreement of Mr. Condon, departed for France with the children for two months. During her time in France, Ms. Cooper purchased a home (possibly with a monetary contribution from Mr. Condon) and enrolled Bayard in school. The circumstances under which Ms. Cooper extended her stay in France and Mr. Condon delayed his arrival are unclear. Mr. Condon arrived in France in late October and stayed through New Year's 1994. Ms. Cooper was in France for a total of seven months, and returned with the children to Los Angeles in February with the understanding she could return to France in the summer of 1994, as long as she helped finance the trip.
On the morning of June 28, 1994, an altercation took place between Mr. Condon and Ms. Cooper. The parties dispute what exactly happened, but it included Mr. Condon knocking Ms. Cooper's hands down, and his pulling the phone out of the wall. Ms. Cooper claims her hands were up in a defensive posture, while Mr. Condon claims she had raised her fists to him. He also claims she struck him with a cast-iron frying pan. A building security guard called the police and after speaking to them, Mr. Condon agreed to leave for a few days. Later that evening, Mr. Condon returned to *537 the apartment to shower and change clothes. He assisted with the laundry, putting the children to bed, and slept in the children's room.
The next morning Mr. Condon took keys from Ms. Cooper's possession and went to his office. Ms. Cooper later went to his office and demanded the return of her office keys. When Mr. Condon refused, Ms. Cooper opened his desk drawer, took the family's passports (including Mr. Condon's) and a checkbook, and left. Later that same day, Ms. Cooper went to Mr. Condon's office accompanied by a police officer and secured the return of her keys. She then withdrew all the money in their joint checking account ($2,000), packed her and the children's belongings, and left their apartment for good. She purchased tickets to Australia and flew there with the children, arriving on July 5, 1994. Though Ms. Cooper was in contact with Mr. Condon's solicitor in Australia, Mr. Condon had no contact with his children for at least four months.
Unaware of his family's whereabouts, Mr. Condon petitioned for legal separation on July 5, 1994, in Los Angeles Superior Court. At the same time he secured a temporary restraining order restraining Ms. Cooper from removing the children from Southern California, and filed an order to show cause seeking sole legal and physical custody of the children, with visitation of the children for Ms. Cooper.
Simultaneous with Mr. Condon's filings in California, Ms. Cooper sought to initiate divorce proceedings and secure a protection order from the Australian court. She later dismissed the matrimonial proceeding. She repeatedly refused to provide information concerning the children's whereabouts to Mr. Condon's Australian counsel, and rejected all indirect methods of contact. Her parents even took out protection orders against Mr. Condon, which effectively denied his solicitor the ability to contact them to find the children.[1] Mr. Condon's counsel proceeded to exchange letters with Ms. Cooper's various counsel, and finally via fax with Ms. Cooper herself, seeking to mediate a resolution to the parties' conflict. Mr. Condon's Australian counsel was ultimately unsuccessful in his mediation efforts.
Mr. Condon initiated proceedings on September 9, 1994, in Australia seeking return of his children to the United States under the Hague Convention on the Civil Aspects of International Child Abduction. Ms. Cooper was served by the Australian Capitol Territories Family Court in October under these proceedings, which facilitated Mr. Condon in serving her with this *538 action before the Los Angeles Superior Court. On December 5, 1994, the Australian Family Court ordered the children returned "forthwith" to the United States.
The trial court issued an order on Mr. Condon's request for an order to show cause on December 23, 1994, giving sole legal custody to Mr. Condon and joint physical custody to both parties. The order further required Ms. Cooper to immediately notify Mr. Condon upon the children's return to Los Angeles, give him their physical location and telephone number, and notify him of any change in location within 12 hours of the change. Another order was issued on January 12, 1995, requiring Ms. Cooper to hand over the children's passports to Mr. Condon upon her arrival in Los Angeles, stating the superior court had jurisdiction over the issues of custody and visitation without prejudice, and restating she could not remove the children from Southern California.
Ms. Cooper returned to Los Angeles on or about February 2, 1995. She filed her own order to show cause and petitioned for dissolution of marriage on February 9, 1995. On February 3, 1995, Mr. Condon's order to show cause came on for hearing. The trial court found too much uncertainty in the matter to make final orders, and continued the hearing until May 17, 1995. The court further noted the children's passports were in the possession of Mr. Condon's counsel, awarded joint legal and physical custody to the parties, and established a schedule of visitation for Mr. Condon averaging two afternoons each week and alternating weekends.
Ms. Cooper's order to show cause came on for hearing on March 10, 1995. In its findings and order, the trial court reserved the issue of attorney's fees until May 17th; ordered Mr. Condon to pay $510 per month in spousal support and $1,075 per month in child support; ordered Mr. Condon to maintain Ms. Cooper and the children on his major medical insurance policy; and continued Ms. Cooper's order to show cause for contempt until May 17, 1995. The May 17th date was continued until June 15th, and on that date the parties stipulated to mutual restraining orders to prevent each other from coming within 100 yards of each other, and from contacting each other except in case of an emergency regarding their minor children.
The matter was called for hearing on June 15, 1995, the trial court and counsel conferred in chambers, and the matter was continued to August 16th. The child custody evaluation was filed on June 15, 1995. On July 20, 1995, (perhaps because of what he read in the court-ordered custody evaluation), Mr. Condon retained new counsel. On July 24th, new counsel for Mr. Condon made an ex parte motion to continue a hearing set for July 25th. In *539 its order after the hearings on July 25, 1995, the trial court clarified issues related to the pickup and drop-off of the children for visitation, required the parties to communicate with each other only through the exchange of written communication placed in the children's backpacks, and arranged for Ms. Cooper to retrieve her art supplies and finished works from Mr. Condon.
On August 16, 1995, the trial court began a hearing for temporary orders pending trial. The court-ordered child custody evaluation was entered into evidence and sealed by order of the court. Further unreported argument was heard on August 17th on whether the trial court should issue an interim order allowing Ms. Cooper to take the minor children back to France to complete a commissioned artwork for Prince Charles. The trial court's ruling on this interim order is not in the record.
The trial court heard Mr. Condon's ex parte motion requesting random drug testing and expanded visitation on September 22, 1995. While the trial court only changed visitation to the extent of allowing Mr. Condon to take the children to his brother's wedding in New York, it did issue an interim order allowing both parties to request two random drug tests of the other on twelve days' notice, paid for by the requesting party. Ms. Cooper did test positive for marijuana at least once in one of these random tests.
Trial on the issues of custody and visitation began on November 13, 1995. The parties had previously stipulated the August 16, 1995, hearing be deemed a portion of this trial, and all evidence received at that time was considered trial evidence. All declarations submitted in the case were received into evidence and the trial court took judicial notice of all declarations in the file as of November 14th. Trial continued for six more days in November[2] and three in December,[3] and the matter was taken under submission on December 29, 1995.
The trial court issued its statement of intended decision on February 1, 1996. The trial court believed there was "a significant level of truth in the allegations that each party [made] regarding the other party," and each was *540 able to provide adequate parenting of their children. The trial court concluded that while "it would be in the children's best interest to spend significant periods of unmonitored time with each parent ... it was also in their best interest that Ms. Cooper be allowed to reestablish her residence in Australia." The children would spend their school time with her, and their four vacations with Mr. Condon.[4] Because the court found the balancing of factors "only slightly favor" Ms. Cooper being allowed to remove the children to Australia, the court would require the children to remain in Los Angeles with primary physical custody to Mr. Condon if Ms. Cooper chose to relocate to France. The factors the trial court used in its analysis included Ms. Cooper's ability to financially support herself in Australia rather than be wholly dependent on Mr. Condon for support; the impact of the parties' stressful relationship on the children; Ms. Cooper's extensive family in Australia; the children's primary emotional attachment to their mother; and, the children's lack of a firm long-time base in California.[5]
In addition to the custody orders, the trial court established a unique arrangement for child and spousal support. While Ms. Cooper and the minor children remained in Los Angeles, Mr. Condon was to pay $914 per month in child support and $430 per month in spousal support.[6] Starting on the first or fifteenth following Ms. Cooper's relocation to Australia, child support would be reduced to a total of $650 per month and spousal support would fall to $180 per month. In place of the monthly support payments, Mr. Condon would be required to contribute $400 each month to a "travel-trust fund," which would be set up to pay for the children's round-trip transportation from Australia or Mr. Condon's to Australia. Payments would be made into the "travel-trust fund" until it totaled $5,000, at which point Mr. Condon would supplement his child and spousal support payments. When the fund fell back below $5,000, these supplemental payments would cease.
The court's order specifies Mr. Condon is responsible for all transportation of the children back and forth to Australia, as well as for an adult to accompany the children from Australia to Los Angeles.[7] Ms. Cooper is responsible for the costs of an adult traveler to accompany the children's *541 return from Los Angeles to Australia. Mr. Condon was also required to contribute $5,000 toward Ms. Cooper's attorney's fees.
On February 23, 1996, Mr. Condon filed a motion for reconsideration. (Code Civ. Proc., § 1008.) Though filed more than 10 days after the court issued its statement of intended decision, Mr. Condon claims he did not receive a copy of the court's decision until February 16, due to its delivery to his until-then counsel's former address.[8] He filed his motion within 10 days of receipt of the document. Ms. Cooper opposed the motion for reconsideration. She argued there were no new facts which could not have been discovered previously, the motion did not meet the procedural requirements of Code of Civil Procedure section 1008, and was untimely. Mr. Condon filed a reply, claiming the court had limited his rebuttal witnesses and did not hear certain relevant testimony. The court denied Mr. Condon's motion for reconsideration on March 13, 1996.
Thereafter, Mr. Condon filed a motion for new trial on May 3, 1996. (Code Civ. Proc., § 657.) Mr. Condon's motion focused on the legal and psychological implications of Ms. Cooper's move-away with the children to Australia.[9] Ms. Cooper filed her response on May 16th, to which Mr. Condon responded on May 19th. The court denied Mr. Condon's motion on May 20, 1996, at which time it also modified its statement of intended decision. Mr. Condon filed a timely notice of appeal.

DISCUSSION
In the following discussion we first consider the evolving law governing disputes when a custodial parent proposes to move away from the area where both divorced parents and their children have resided. We then explore the unique factors added to the equation when the proposed relocation is to a *542 foreign country rather than within California or to another state. Finally, we evaluate the instant order in the light of these principles and decide whether it should be sustained.

I. Intrastate and Interstate Relocation of Children: the Current Law.

In recent years, more and more jurisdictions have liberalized their rules for allowing relocation of children after the parents divorce. In earlier years the majority of states placed the burden on the parent seeking to move away with the children to demonstrate the proposed relocation was in the "best interests of the child." (D'Onofrio v. D'Onofrio (1976) 144 N.J. Super. 200, 206 [365 A.2d 27, 30], affd. 144 N.J. Super. 352 [365 A.2d 716] ["real advantage" to custodial parent and child must be shown to justify removal]; Weiss v. Weiss (1981) 52 N.Y.2d 170, 176-176, [436 N.Y.S.2d 862, 418 N.E.2d 377, 380-381] ["exceptional circumstances" must be shown to justify child's removal from jurisdiction].) Now many states have shifted the burden to the nonmoving parent (In re Marriage of Frederici (Iowa 1983) 338 N.W.2d 156; Auge v. Auge (Minn. 1983) 334 N.W.2d 393) or placed the parents on an "equal footing" where the court makes an objective determination whether the proposed move or the denial of a move best serves the interests of the children. (Jaramillo v. Jaramillo (1991) 113 N.M. 57 [823 P.2d 299].)
California has followed the national trend. Until 1996, the state's appellate courts had been generally hostile to relocation requests  most requiring the parent seeking relocation to demonstrate the move was necessary and in the best interests of the affected children. (See, e.g., In re Marriage of McGinnis (1992) 7 Cal. App.4th 473, 479 [9 Cal. Rptr.2d 182] [burden is on move-away parent to prove move is essential, expedient and for an imperative reason]; In re Marriage of Roe (1993) 18 Cal. App.4th 1483 [23 Cal. Rptr.2d 295] [disapproving proposed relocation from Los Angeles to Alabama].) But in that year the California Supreme Court confronted the issue and broke with the prevailing view in the Courts of Appeal. (In re Marriage of Burgess, supra, 13 Cal.4th 25.) In Burgess, a trial court had allowed a mother to move 40 miles from one community to another in the same general area and to bring her 2 young children with her. The Court of Appeal reversed this move-away order but the Supreme Court ruled otherwise.
The Burgess court shifted the burden from the custodial parent seeking to move away with the children and placed it squarely on the noncustodial parent remaining behind. "[I]n a matter involving immediate or eventual relocation by one or both parents, the trial court must take into account the presumptive right of a custodial parent to change the residence of the minor children, so long as the removal would not be prejudicial to their rights or *543 welfare. (Fam. Code, § 7501 [`A parent entitled to custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child.'].)" (13 Cal.4th at p. 32.) As to relocations within the United States, unless the parents are truly sharing joint physical custody, a move-away does not represent a change of condition requiring the parent proposing to move away to establish a need or even a justification for relocating to another geographic area.

II. The Unique Characteristics of Relocations to Foreign Countries.

Our research has uncovered several reported decisions elsewhere in the country which considered requested move-away orders to foreign countries. Almost evenly divided on the issue, these courts differed both in the values they considered relevant and the weight they assigned those values.
Some decisions treat the children of divorce as virtual chattels whose possession had been awarded to the custodial parent. Like their other possessions, custodial parents were free to take their children with them when they moved to a foreign country. (See, e.g. Bozzi v. Bozzi (1979) 177 Conn. 232 [413 A.2d 834].) These courts exhibited little concern about the reasons for the move or the noncustodial parent's visitation rights or even the best interests of the children. But the decisions lack persuasive value, however, in present day California where the Legislature has created a statutory framework favoring joint custody, promoting the continued involvement of both parents in their children's lives, and establishing the best interests of the children as the paramount criteria to be applied in custody determinations.
At the other extreme are opinions from the 1970's and 1980's which denied relocation to foreign countries in part because of the unique characteristics of a foreign rather than a domestic move-away.
In Otava v. Otava (Minn. Ct. App. 1985) 374 N.W.2d 509, 28 days after the divorce decree, the mother, who also was the custodial parent, sought to move away with her 12-year old son to Finland. The trial court denied the request and the appellate court affirmed. The mother was working two part-time jobs in Minnesota. The avowed purpose for the move to Finland was to study child care services leading to full-time employment in that field in that country and "`a better life for herself and her minor son.'" (374 N.W.2d at p. 510.) As in the instant case, the mother had an extended family in the country to which she sought to move and the child had spent time there during an earlier marital separation.
The father responded he presently lived close to the son and spent a great deal of time with him. He further emphasized the close relationship between *544 that son and his son by a previous marriage. The father argued he lacked the means to afford frequent visitations overseas. The trial court found the move was not in the child's interest and denied the mother's request.
The appellate court concluded Minnesota law required custody modifications only if "`necessary to serve the best interests of the child" and visitation modifications likewise must "serve the best interests of the child.'" (374 N.W.2d at p. 511.) The court rejected the mother's argument the burden fell on the noncustodial parent, the father, to demonstrate the move "contradicts the best interests of the child," the test announced in a prior Minnesota Supreme Court opinion, Auge v. Auge, supra, 334 N.W.2d 393, 399. The court pointed out that test only applies when the denial of a move "is tantamount to a change of custody" (374 N.W.2d at p. 511) while the mother in Otava had said she would remain in Minnesota if the court denied her request. It further pointed out the Auge decision expressly reserved the question whether the burden shifted to noncustodial parents in proposed move-aways to foreign countries. (Ibid.)
The appellate court did not rest its decision on either of these grounds, however. Instead, it found the allocation of the burden was irrelevant because the evidence was sufficient in either instance to support a denial of the mother's requested move to Finland. "The move would seriously impair visitation contacts with the boy's father, and it would require the child to sacrifice an important relationship with his brother.... [¶] The trial court could reasonably find that harm in moving the child was not outweighed by the value of contacts for the child in Finland. The advantages for a move are unclear. They relate mostly to the child's financial circumstances, but there was no evidence that a move to Finland would improve the financial situation of appellant and the child.... [¶] In addition, the supreme court has indicated that when removal is contemplated the trial court must attempt to maintain such visitation contacts as are `reasonable and necessary to maintain a good relationship between the noncustodial parent and the child.' [Citation.] Present visitation arrangements can be set aside `where reasonable alternative visitation is available and where the advantages of the move are substantial.' [Citations.] The trial court here received ample evidence that if the child moved to Finland, his father would be unable to maintain a normal visitation relationship. Thus, no reasonable alternative visitation arrangement was feasible." (374 N.W.2d at. p. 511.)
The Minnesota court's rationale would have applied equally to any move of substantial distance, whether to another nation or not. But in O'Shea v. Brennan (1976) 88 Misc.2d 233 [387 N.Y.S.2d 212], a New York court invoked considerations unique to foreign move-aways. Interestingly, as in the instant case the proposed move in O'Shea was to Australia. This time the *545 mother had remarried to an Australian and desired to settle there with her child and new husband. The father and mother had joint custody although the mother had physical custody except during summers. In her petition seeking relocation to Australia, the mother consented to a longer visitation period with the father during summers.
After reciting statutory provisions and court decisions declaring trial courts are to make custody and visitation rulings on the basis of the "best interests of the child" the court discussed why it was not in the best interests of this  or apparently any  child to be removed from the United States to another country.
"Once the infant is removed to Australia, this court loses its jurisdiction over her. The well-settled rule in New York State is that the full faith and credit clause of the Constitution does not apply to custody decrees. Once the infant is before our court we will assume jurisdiction and as parens patriae decide what is best for the child. The Australian courts will exercise the same prerogative and will assume jurisdiction over the infant.
"It is true that `nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. It would be difficult to exaggerate its value and importance.' [Citation.] This court will jealously guard this treasured birthright of the child. [Citations.] All Americans, no matter what economic, social, religious or racial group they happen to fall into, share in a priceless possession, the right of being a citizen in this great country of ours. `I was born an American, I will live an American, I shall die an American.' (Daniel Webster, speech, July 17, 1850.)
"To award custody to the mother would, in effect, be to completely deny to the infant the right to the love, parental care, companionship and guidance of her father. Further, it would deprive her of the right to be raised and educated in her own country  which is part of her birthright. Moreover, it would deprive the petitioner of the natural rights he has as a father  since he would be completely cut off from his daughter by a distance of many thousands of miles. [Citations.]
"The benefits, environment, educational opportunities, cultural climate, as well as the economic standards of the father are well known factors which would act toward the benefit of the child if custody is awarded to the father. However, these factors would be unknown if the mother is permitted to remove the infant to Australia.
"The permanent removal of a domiciliary child must not be permitted where it renders rights of visitation illusory. [¶] ... [¶] In view of the circumstances, I find that the mother is not acting in the best interests of her *546 daughter in attempting to take her to Australia, where the child will be raised, educated and brought up for all practical purposes as an Australian. [¶] ... [T]he best interests of this seven-year-old child require that custody be given to the father...." (O'Shea v. Brennan, supra, 387 N.Y.S.2d 212, 215-216.)
In Daghir v. Daghir (1981) 82 A.D.2d 191 [441 N.Y.S.2d 494], affirmed 56 N.Y.2d 938 [453 N.Y.S.2d 609, 439 N.E.2d 324], the New York courts once again denied a move-away to a foreign country, this time France, and even though it was to be limited to two years' duration. Like the Minnesota court in Otava the New York appellate court elevated the loss of a strong father-child relationship over the mother's interest in joining her second husband, who had taken a job in France.
In The Matter of Marriage of Meier (1979) 286 Or. 437 [595 P.2d 474], the Oregon Supreme Court denied approval of a relocation to Canada, announcing custodial parents could justify such a move only by demonstrating the best interests of the children would be better served by permitting the move than by requiring them to remain in their current place of residence. (See also other cases collected in Annot., Court-Authorized Permanent or Temporary Removal of Child by Parent to Foreign Country (1984) 30 A.L.R.4th 548.)
From a review of these out-of-state opinions it is possible to extract at least three concerns which make foreign relocations different in kind from intrastate and even most interstate move-away cases.
First, the cultural problem. In some cases, to move a child from this country to another is to subject him or her to cultural conditions and practices far different from those experienced by American citizens or to deprive the child of important protections and advantages not available in the other country. To pose an extreme example, who could dispute a proposed relocation of a female child to a country practicing genital mutilation represents a "changed condition" requiring an inquiry whether this move is in the "best interests" of that child? Similarly, how about a move to a country where females were not offered the opportunity for higher education or the freedom to pursue careers? Or a move of any preteen or teenager to a country where the language is one unfamiliar to that child. Or, consider a proposed relocation of any child to a nation governed by a dictator or any nation which denies its citizens the freedoms and rights guaranteed in the United States and other democracies.
Second, the distance problem. Except for Mexico or Canada, foreign relocation cases in this state inevitably involve a move to a different *547 continent  typically 8,000 miles or further and 8 or more time zones away from California. With those great distances come problems of expense, jet lag, and the like. For a person of average income or below, an order relocating his or her child to a faraway foreign country is ordinarily tantamount to an order terminating that parent's custody and visitation rights.
Third, and most difficult, is the jurisdictional problem. California court orders governing child custody lack any enforceability in many foreign jurisdictions and lack guaranteed enforceability even in those which subscribe to the Hague Convention on the Civil Aspects of International Child Abduction. Thus, the California courts cannot guarantee any custody and visitation arrangements they order for the nonmoving parent will be honored.
In our view, a trial court confronted with a parent's request to relocate a child to a foreign jurisdiction should consider all three of the above factors, in addition to those affecting a domestic move-away. A move-away to certain cultures may profoundly and adversely affect the "best interests of the child" and could justify a denial of such a relocation. One does not have to be as chauvinistic as the judge who wrote O'Shea v. Brennan, supra, 387 N.Y.S.2d 212 to conclude the best interests of an American child would be ill-served by a move to a society that would subject him or her to oppressive practices or deny the child important rights.
Similarly, except for those of considerable means, any relocation to another continent is likely to represent a de facto termination of the nonmoving parent's rights to visitation and the child's rights to maintain a relationship with that parent. (See Otava v. Otava, supra, 374 N.W.2d 509, 511.) Thus, when a relocation would have this practical effect, before allowing the move-away a trial court should require the moving parent to satisfy the burden of showing the termination of those rights would be in the best interests of the child. If the moving parent cannot satisfy this burden, perhaps he or she could tender an arrangement where the moving parent finances the other parent's visitation or the child spends alternate years in the two countries, or some other plan which accommodates the valuable relationship between the nonmoving parent and the child.
Finally, before permitting any relocation which purports to maintain custody and visitation rights in the nonmoving parent, the trial court should take steps to insure its orders to that effect will remain enforceable throughout the minority of the affected children. Unless the law of the country where the children are to move guarantees enforceability of custody and visitation orders issued by American courts, and there may be no such country, the court will be required to use its ingenuity to ensure the moving *548 parent adheres to its orders and does not seek to invalidate or modify them in a foreign court.
Several courts which allowed relocation to a foreign country likewise recognized the enforceability problem. (Mitchell v. Mitchell (1984) 252 Ga. 46 [311 S.E.2d 456, 459]; Matter of Marriage of Ditto (1981) 52 Or. App. 609 [628 P.2d 777, 779-780]; see also, In Re Marriage of Creedon (1993) 245 Ill. App.3d 531 [185 Ill.Dec. 724, 615 N.E.2d 19, 22-23].) These courts required the relocating parent to post a substantial financial bond which would be forfeited if the parent failed to comply with the custody and visitation arrangements ordered by the American court. Presumably the parent would have forfeited this bond even if he or she obtained a modification in those arrangements from the foreign court. Another possibility available, whether or not the move-away parent has the funds to post a substantial bond, would be to terminate or reduce spousal or child support payments should the moving parent frustrate the custody and visitation provisions in the California court's order and the foreign court refuses to enforce those provisions.[10] These measures also would be appropriate if the move-away parent sought and obtained a foreign court order inconsistent with the California order.

III. The Terms of the Order Permitting Relocation to Australia Are Appropriate but the Order Fails to Guarantee Enforceability in Australia or to Adequately Secure Enforcement.

(1a) In the instant case, the first two factors unique to foreign relocations are satisfied, for different reasons. On its face, a move-away to *549 Australia does not raise any significant cultural problem. Courts do not have to hear expert testimony to conclude the United States and Australia share common cultural values and the move to Australia is unlikely to expose the Condon children to any threatening cultural practices or deny them fundamental civil and political rights. Nor did Mr. Condon prove otherwise in the trial court. As to the distance and accompanying expense problems, we explain below the trial court implicitly dealt with them by fashioning an order which finances the father's visitation costs through reductions in his substantial child and spousal support obligations.
The third concern  that of jurisdiction  remains, however. We turn to it after explaining why we affirm the other terms of the custody and visitation arrangements the court ordered. While we are not certain the members of this court would have permitted this relocation, given the implications for the relationship between father and children, we conclude under the prevailing standard of review the substantive terms of the trial court's order fall within the permissible span of that court's discretion.

A. The Trial Court Did Not Abuse Its Discretion in Permitting Relocation to Australia on the Terms Provided for the Father's Rights to Custody and Visitation.

(2) The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. (In re Marriage of Burgess, supra, 13 Cal.4th 25, 32, citing Gudelj v. Gudelj (1953) 41 Cal.2d 202, 208 [259 P.2d 656].) The Burgess court further defined the test as "whether the trial court could have reasonably concluded that the order in question advanced the `best interest' of the child." (13 Cal.4th at p. 32.)
(1b) Great deference must be given to the trial court's adjudication of the facts, and in the instant case there is no doubt the court made herculean efforts to fairly balance all the factors in the case. The court conceded the balance of competing considerations was very close, and only slightly favored its order allowing Ms. Cooper to move away to Australia with the minor children. Nonetheless, the trial court took extraordinary pains to craft measures calculated to minimize the adverse effects of the move on the father-child relationship, assuming those measures remain enforceable.[11]
Though the case at bar was decided before the Supreme Court issued its decision in In re Marriage of Burgess, supra, 13 Cal.4th 25 (Burgess) our *550 decision is bound by that precedent. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 928, pp. 964-965.) The Burgess court held a custodial parent moving away with his or her minor children is not burdened by any requirement to prove the move was necessary. (Burgess, supra, 13 Cal.4th at p. 36.) However, the court then stated "[a] trial court may consider the extent to which the minor children's contact with their noncustodial parent will be impaired by relocating," though it declined to state any particular formula for determining contact and visitation, nor a requirement to "preserve the predissolution status quo." (Ibid.)
Acknowledging Burgess as the controlling law in the area of move-away orders, it is nevertheless distinguishable on its facts from the instant case. While Burgess dealt with an initial custody order allowing a move-away of only 40 miles from Tehachapi to Lancaster, both in the state of California, the case at bar allows a trans-Pacific move-away to a foreign country 8,000 miles away. Whereas the Burgess order was for sole physical custody to the mother and a right of visitation by the father, the court in the instant case made an order awarding joint legal and physical custody to both parents. Finally, Burgess involved a situation where both parents were equally supportive of the other's right to contact. In the present case, the court found Ms. Cooper's removal of the children from California to Australia "showed no concern for the interests ... of the children for a relationship with [Mr. Condon]." These distinguishing features require us to look carefully at the decision below and to question applying too strict an interpretation of Burgess on the instant case.
Footnote 12 in Burgess suggests "[a] different analysis may be required when parents share joint physical custody of the minor children under an existing order and in fact, and one parent seeks to relocate with the minor children." (Burgess, supra, 13 Cal.4th at p. 40, fn. 12, italics in original.) Whereas the issue under Burgess is "whether a change in custody following relocation is "`"essential or expedient for the welfare of the child"'" (id. at p. 38, original italics), the trial court in a de facto joint custody situation may *551 modify or terminate the custody order if the best interest of the child requires it to do so, and further "must determine de novo what arrangement for primary custody is in the best interest of the minor children." (Burgess, supra, 13 Cal.4th at p. 40, fn. 12.)
Addressing this footnote, Brody v. Kroll (1996) 45 Cal. App.4th 1732, 1736 [53 Cal. Rptr.2d 280], a case where the mother was the "primary caretaker," and actual joint custody existed between the parents, the Court of Appeal held the trial court "should have determined whether it was in [the child's] best interest to give the mother virtual sole custody and allow her to take the child to Connecticut." (Brody v. Kroll, supra, 45 Cal. App.4th at p. 1737.)
In a more recent case where the same Fourth District Court of Appeal came to the opposite result, the court explained the Burgess footnote. "[T]he `different analysis' mentioned by Burgess arises out of the disruption of the status quo which necessarily inheres in a move-away case where there is genuine joint physical custody since, in such an instance, it is unavoidable that the existing custody arrangement will be disrupted. One parent or the other must be given primary physical custody. Accordingly, a `de novo' determination  in effect, a `reexamination' of the basic custody arrangement  makes sense." (In re Marriage of Whealon (1997) 53 Cal. App.4th 132, 142 [61 Cal. Rptr.2d 559].)
The facts of the instant case are somewhere in between Brody and Whealon. The status quo at the time of the trial court's order was that court's own temporary joint custody order during the pendency of the trial. While the court found Ms. Cooper was the children's primary caretaker before the separation, the children lived under actual joint custody from the time of their return to America in February 1995, until their departure for Australia late in 1996. The case at bar is also distinct from both Brody and Whealon because it has to do with an initial custody order and not a request for modification of an existing custody order.
The court acknowledged Mr. Condon had a good relationship with his sons. "The evidence shows a strong and bonded relationship between the petitioner and the children no matter what the prior circumstances were."
Family Code section 3020 states it is the public policy of California to assure minor children "frequent and continuing contact" with both parents after the parents' separation or dissolution of marriage, and to encourage parents to "share the rights and responsibilities of child rearing." (Fam. Code, § 3020, subd. (b).) The only exception to this policy is where the *552 contact "would not be in the best interest of the child, as provided in Section 3011 [factors bearing on the best interest of a child]." (Ibid.) The court did not find anything in the facts of the instant case necessitating a restriction on the contact between Mr. Condon and Bayard and Henry. On the contrary, the court believed "that unless [Mr. Condon] has the most frequent possible contact with the children his relationship with them is likely to be damaged in ways that will have profound effects on them for the balance of their lives."
The court's award of joint legal and physical custody of the minor children to Mr. Condon and Ms. Cooper was technically feasible under its order allowing Ms. Cooper to move away to Australia. The question remains whether it was in the children's "best interest." On one hand, joint legal custody, dealing with decisionmaking power over the children's health, education, and welfare, can certainly be accomplished transcontinentally. (Fam. Code, § 3003.)[12] The stickier issue is joint physical custody. The Family Code states a parent with joint physical custody of his minor children shall have "significant periods of physical custody," which shall be manifested in such a way as to "assure a child of frequent and continuing contact with both parents." (Fam. Code, § 3004.) During the pendency of the trial Mr. Condon had physical custody of his children for approximately two to four days a week. As a result of the court's order, Mr. Condon now has physical custody of his children in California for 12 days, 3 times a year and for a more extended 6-week period, all coinciding with the Australian school holidays, a total of nearly 12 of the 52 weeks in the year. Additionally, he may exercise custody rights in Australia for up to 15 days in any given month. While it certainly does not constitute the weekly "frequent and continuing contact" that existed during the pendency of the trial, the total number of days certainly remains a "significant period of physical custody," in line with the requirements of Family Code section 3004[13] and the maintenance of a meaningful relationship between Mr. Condon and the two boys.
The California Supreme Court in Burchard v. Garay (1986) 42 Cal.3d 531, 541 [229 Cal. Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237] emphasized *553 the importance of "stability and continuity in the life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds." The child's need for continuity and stability assumes an "increasingly important role" when custody continues over "a significant period" of time. (Id. at p. 538) The trial court in the instant case correctly found Ms. Cooper had been the children's primary caregiver, and that they spent approximately nine months of their respective lives away from Mr. Condon before Ms. Cooper removed them to Australia in July, 1994. Seemingly, the court weighed these facts in favor of allowing Ms. Cooper to move away, implicitly addressing Burchard v. Garay and finding little continuity or stability in the children's lives that would favor maintaining the status quo of two to four days a week with Mr. Condon. The court described its function as "not to reward or punish the prior behavior of any party, but to judge each party's current ability to provide care for the children."
True, the prior behavior of the parties directly bears on custody determinations. Family Code section 3011 requires the court, in evaluating the best interest of the child, to consider, among other factors, the health, safety, and welfare of the child; any history of abuse by one parent against the child or against the other parent; and, the nature and amount of contact with both parents. (Fam. Code, § 3011, subds. (a)(b) &(c).)[14] It is more than apparent the court did consider these factors in making its order allowing Ms. Cooper to move-away to Australia.[15] The court even expressly acknowledged Ms. Cooper's unauthorized removal of the children to Australia in July 1994, in its statement of intended decision, yet on balance found reasons justifying the proposed permanent move-away to Australia.
Recognizing the acknowledged importance of maintaining a meaningful and ongoing relationship between Mr. Condon and his children across some 8,000 miles, the trial court imposed conditions which made that goal both logistically possible and financially feasible. The boys journey to Los Angeles four times a year and the father is also allowed half-time visitation if business or holidays bring him to Australia. The father can pay for his boys' four annual trips from Australia to Los Angeles out of a travel fund *554 assembled from reductions in his previous levels of spousal and child support.
The trial court also recognized the fragility of the balance favoring approval of the requested move-away. It specifically forbade Ms. Cooper from relocating to France, a move she had favored at one time. Australia offers advantages  a common language, the wife's extended family, the boys' earlier significant residence there, and the like  which France does not possess. France might have appealed to Ms. Cooper because of career aspirations, but the court did not consider a move to that country in the best interests of the children. In that we agree with the trial court.
Applying the abuse of discretion standard Burgess reaffirmed, by a close margin we conclude the careful balance the trial court struck in this case could be reasonably found to serve the best interests of the Condon children. But this careful balance is reasonable only if it also is enforceable.

B. The Court Order Allowing Ms. Cooper to Move Away to Australia With the Children Lacks Guaranteed Enforceability In the Australian Courts.

Several factors present in this case underscore the critical importance of effective, long-term enforcement of all the conditions the California court found it necessary to include before it would authorize a move-away to Australia. The delicate balance the trial court struck depends on Ms. Cooper's placing her two boys on flights to Los Angeles four times a year and resisting the temptation to move away once again to France. Meantime Ms. Cooper once before defied the order of a California court by secretly transporting her children to Australia and keeping them there without allowing Mr. Condon any access until the Australian courts ordered their return under mandatory provisions of the Hague Convention on the Civil Aspects of International Child Abduction.
The trial court's order granting Ms. Cooper the right to move away to Australia with the minor children assumed the Australian court would honor it during the minor children's entire period of minority. There is no question the trial court attempted to carefully balance all the competing factors in the present case in order to fashion an appropriate judgment and order. No matter how careful its judgment, however, for reasons explained below, once Ms. Cooper relocates to Australia, the California court has no way of guaranteeing its intricate order will be enforced by the foreign court.

*555 1. The legal basis for continuing jurisdiction over the modification of child custody decrees in the California and Australian courts.

The Uniform Child Custody Jurisdiction Act (UCCJA), codified in Family Code sections 3400 to 3425, provides the exclusive method for determining subject matter jurisdiction in child custody cases in California. (In re Stephanie M. (1994) 7 Cal.4th 295, 310 [27 Cal. Rptr.2d 595, 867 P.2d 706], citing Adoption of Zachariah K. (1992) 6 Cal. App.4th 1025, 1034 [8 Cal. Rptr.2d 423].) Family Code section 3403 gives California courts jurisdiction to make or modify child custody determinations.[16] (Brossoit v. Brossoit (1995) 31 Cal. App.4th 361, 368-369 [36 Cal. Rptr.2d 919].) However, the UCCJA, as codified in Family Code section 3414, subdivision (a), gives another state's court continuing jurisdiction over its child custody determinations by preventing a California court from modifying the decree as long as the first court does not concede jurisdiction.[17] The other state's jurisdiction over the modification of custody orders is exclusive, and continues as long as at least one of the parties remains in that state. (Ibid.; Kumar v. Superior Court (1982) 32 Cal.3d 689, 700 [186 Cal. Rptr. 772, 652 P.2d 1003].)[18] Federal law is substantially in accord with the UCCJA.[19]
*556 The intent of the UCCJA has always been that its general policies also apply to international custody disputes. (Fam. Code, § 3424;[20]Plas v. Superior Court (1984) 155 Cal. App.3d 1008 [202 Cal. Rptr. 490], citing Miller v. Superior Court (1978) 22 Cal.3d 923 [151 Cal. Rptr. 6, 587 P.2d 723].)
The Hague Conference on Private International Law, Convention on the Civil Aspects of International Child Abduction (Oct. 25, 1980) 19 Intl. Legal Materials 1501 (Hague Convention), serves an analogous function to the UCCJA in custody disputes involving countries that are signatories to the convention.[21] Unlike the continuing jurisdiction over custody modifications under the UCCJA, however, the Hague Convention protects a custodial parent from unlawful removal or retention of minor children for only one year. (Hague Convention, art. 12, 19 Intl. Legal Materials at 1502.)[22] Only within the first year after the removal of the children from their habitual residence are courts of the country to which the children were removed obligated to order the return of the child forthwith. (Ibid.)
After one year, the rules change. The new country may consider the children "habitually resident" in that country and under the Hague Convention as enacted into Australian law the local court may evaluate issues *557 governing the appropriate custody of the child. (Australian Family Law (Child Abduction Convention) Regulations 1986 (Cth) Reg. 16.)[23] That is, in effect, the Australian courts are free to reconsider and modify the custody arrangements embodied in the foreign court's order.
Registration of the California court order with the Australian courts provides some measure of protection, but not absolute protection. According to Regulation 23(5) of Australia's Family Law Regulations, "[a]n overseas child order registered in accordance with this regulation is enforceable throughout Australia until the registration (including a concurrent registration) has been canceled."[24] (Fam. Law Regs., Reg. 23(5).) An "overseas child order" registered with the Australian court has the same force and *558 effect as if it were an order made by that court. (Fam. Law Act 1975 (Cth) § 70H).[25] Once an "overseas child order" is registered with the Australian courts, the court must not exercise jurisdiction over the making of "residence" (custody) or "contact" (access) orders unless each person entitled to custody of the child consents to the exercise, or "the court is satisfied that there are substantial grounds for believing that the child's welfare requires that the court exercise jurisdiction in the proceedings." (Fam. Law Act 1975 (Cth) § 70J(1)(b).)[26]
The Full Court of the Family Court interpreted this statute in its previous form, Family Law Act 1975 (Cth) section 68(3), to be a prima facie test for the exercise of jurisdiction. (In the Marriage of Domroese and Leggett, supra, 20 Fam. L.R. 213, quoting In the Marriage of Trnka (1984) 10 Fam. L.R. 213.)
Once an Australian court has exercised jurisdiction in a proceeding for a custody or access order in relation to a child subject to an "overseas child order," it must not make a new custody or access order unless it is satisfied: "(a) that the welfare of the child is likely to be adversely affected if the order is not made; or [¶] (b) that there has been such a change in the circumstances of the child since the making of the overseas child order that the residence order, contact order or care order ought to be made." (Fam. Law Act 1975 (Cth) § 70J(2).) The Full Court in In the Marriage of Domroese and Leggett stated the requirements of sections 68(3) and 68(4) of the previous version of *559 the Family Law Act were independent of one another: "jurisdiction is exercised if a prima facie case is made out," and a revised custody order is only made by the Australian court if "the higher test" of section 68(4) is satisfied. (In the Marriage of Domroese and Leggett, supra, 20 Fam. L.R. 213.)

2. Australian law does not require the continued enforcement of the California child custody order.

There are three areas where an Australian court can disregard the continuing jurisdiction of a California court over modifications to its child custody orders. These are: (1) after the first year, under the Hague Convention as manifested in the Family Law (Child Abduction Convention) Regulations; (2) under Family Law Act 1975 (Cth) section 68(3) (now § 70J(1)) which deals with the exercise of jurisdiction where a foreign order has been registered; and (3) by making a new order after exercising jurisdiction over the foreign custody order. (Fam. Law Act 1975 (Cth) § 68(4) [now § 70J(2)].)
The Australian Family Law (Child Abduction Convention) Regulations control how an Australian court responds to orders made through Hague Convention procedures for the return of children illegally removed or retained from their "habitual residence." Regulation 16(1) requires the court to make an order returning children who have been illegally removed to or retained in Australia, provided less than one year has elapsed. (Fam. Law (Child Abduction Convention) Regs., Reg. 16(1)(a).) If more than one year has passed the court must still make the return order, unless it is satisfied the child has "settled in his or her new environment." (Fam. Law (Child Abduction Convention) Regs., Reg. 16(1)(b).) Regulation 16(1)(b) gives parents who have been illegally denied custody of their children after one year's absence from their home no assured method of securing the return of their children.
Mr. Condon points out in his letter brief the children are now residents of Australia, having lived there since late 1996 pursuant to the order now on appeal, and are now attending Australian schools.[27] The children also have been Australian citizens from birth, have resided there for several periods in their lives, and have their mother's family residing in that country. Since the children have now been resident in Australia for over a year, the Australian court would likely consider them "settled" there in the meaning of Family Law (Child Abduction Convention) Regulations, Regulation 16(1) and therefore not be required to make an order returning them to California.
*560 Even if the court did not consider Bayard and Henry settled in Australia, under Family Law (Child Abduction Convention) Regulations, Regulation 16(3) it could refuse to order their return if it determined Mr. Condon was not exercising his custody rights before their retention in Australia (Reg. 16(3)(a)(i)); had consented to the retention (Reg. 16(3)(a)(ii)); or it felt there was a "grave risk of harm" the children would be exposed to "physical or psychological harm or otherwise place [them] in an intolerable position" if they were returned to California (Reg. 16(3)(b)). Regulation 16 of the Family Law (Child Abduction Convention) Regulations does not provide strong protection of California's continuing jurisdiction over its child custody determinations.
Aside from the Hague Convention, registration of the California custody order is the other method of seeking enforcement. Mr. Condon correctly focused on Australian Family Law Act 1975 (Cth) sections 68(3) and 68(4) (now § 70J(1) - (2)) in his letter brief. These sections allow the Australian court to, first, assert jurisdiction over the overseas custody order, and later, make a new custody order once it determines the children's welfare would be adversely affected if it did not act. While the court is not certain to exercise jurisdiction or issue a revised order, it is well within its power to do so. Of course, once an Australian court asserts jurisdiction, it can look into the substance of the custody issues and modify the California order, something the trial court below understood to be solely within its power as long as one of the parties remained in California.
Ms. Cooper correctly argues Kumar v. Superior Court, supra, 32 Cal.3d 689, is controlling law in California with regard to continuing jurisdiction to modify child custody orders made in California or other American states. Following Kumar and the stated policy of Family Code section 3424 to extend the UCCJA to the international arena, it is probable, indeed nearly certain, a California court would enforce an Australian court custody order that was registered here. Kumar, however, is not controlling law for Australian courts. If an Australian court believes the children's welfare would be adversely affected by its refusal to exercise jurisdiction over the California order, it may assert jurisdiction. (Fam. Law Act 1975 (Cth) § 70J(2).) Once it has asserted jurisdiction over the foreign custody order, the Australian court can modify the California order if it is satisfied the children's welfare would "likely" be "adversely affected" by its inaction, or due to a "change of circumstances." (Fam. Law Act 1975 (Cth) § 70J(2).) Ms. Cooper only obfuscates the issue by quoting the first half of Family Law Act 1975 (Cth) section 68(3), which includes everything before the word unless: "a court in Australia shall not ... exercise jurisdiction ... [unless]."
Indeed the facts are the children are now residents of Australia, are now attending Australian schools, have been Australian citizens from birth and *561 previously resided for significant amounts of time in Australia, and their mother and her family all reside in that country. This gives that nation's courts what very well could be understood as "substantial grounds for believing that the child[ren]'s welfare requires that the court exercise jurisdiction in the proceedings." (Fam. Law Act 1975 (Cth) § 70J(1)(b).) If an Australian court elected to do so, it could easily undo the intricate matrix of conditions the California court imposed in order to justify Ms. Cooper's move-away to Australia. It is possible, although not probable, an Australian court with less stake in the children's relationship with a California father would consider it against the best interests of those children to require them to travel eight thousand miles and cross eight time zones four times a year. Or an Australian court might have a different view about the desirability of permitting one of its citizens and her children to resettle in France if such a move would advance the international reputation of one of that nation's artists.[28]
(3) The trial court failed to evidence an understanding its custody order might not be enforced by the Australian courts. Whereas the court could be certain a similar order allowing a party to move to any of the other 49 states of the union would be enforced under the UCCJA as long as either one of the parties remained in California, the enforceability of the order in the instant case, especially after the children had resided in Australia for more than 1 year, is uncertain at best. An unenforceable order is no order at all and a custody order which is guaranteed enforceability for only 1 year of the remaining 10 to 12 years of minority represents an abuse of discretion by the issuing court. Such an order does not adequately protect the interests of this state's citizen, the father, in maintaining a relationship with his children, nor does it adequately preserve the policies this state's Legislature has declared should govern child custody arrangements.
We do not mean to suggest the Australian courts necessarily  or even probably  will overrule the California court's calculation of the best interests of the Condon children. But that possibility exists. Nor do we assume Ms. Cooper will disobey the California order or seek to modify its terms in the Australian courts rather than this state's courts. Indeed Mr. Condon, who represented himself at oral argument in this court, conceded his ex-wife thus far had complied completely with the California order. Nonetheless, one year is only the beginning for an order that has a dozen years to run. And an order a party voluntarily obeys for a while is not the same as one which is enforceable without choice for the duration.
In order to avoid this enforceability conundrum, Ms. Cooper's supplemental brief offers to concede the continuing jurisdiction of the California court. *562 The issue remains, however, whether the Australian court will enforce a concession of jurisdiction. Accordingly, we remand to the trial court to obtain a concession of jurisdiction and furthermore to create sanctions calculated to enforce that concession. At a minimum, such sanctions should include the posting of an adequate monetary bond within Ms. Cooper's means and the potential forfeiture of all or some support payments upon proof Ms. Cooper is disregarding essential terms of the court order or has violated the concession of jurisdiction by pursuing modification of the California order in the courts of Australia or any other nation. Mr. Condon should not, however, be permitted to unilaterally terminate or reduce support payments because the terms of the California orders have been violated. Rather he will only be allowed to petition the trial court for such relief.
These provisions should be incorporated in a revised order approving Ms. Cooper's move-away to Australia. An unenforceable order is no order at all, and thus is void. In the event Ms. Cooper chooses to withdraw her offer to concede jurisdiction in the California courts, the trial court shall impose a specific requirement the parties address any requests for modification of its order to the appropriate California court and furthermore to provide for sanctions, including at least those described above, should Ms. Cooper disobey this requirement or should the Australian courts fail to enforce other terms of the California order.

DISPOSITION
The judgment is reversed and the cause remanded to the trial court with instructions it amend its order permitting Ms. Cooper to move away to Australia with her children to incorporate Ms. Cooper's concession of continuing jurisdiction in the California courts and appropriate sanctions to enforce that concession including at least those described in this opinion. If Ms. Cooper withdraws her offer to concede jurisdiction, the amended judgment shall require Ms. Cooper to address any proposed modifications of that judgment to California courts and provide for appropriate sanctions for a failure to do so or should the Australian courts fail to enforce the terms of the California judgment. In other respects, the terms of the judgment are affirmed. Both parties to pay their own costs on appeal.
Woods, J., and Neal, J., concurred.
NOTES
[1] According to Mr. Condon's solicitor, "The force of the order is that my client cannot even ask me to try and locate his children through their grandparents. I am now not even able to write to Mr. and Mrs. Cooper."
[2] Pursuant to the court's findings and order after the hearing on October 5th and filed on November 28, 1995, the trial court gave Mr. Condon custody of the minor children on alternating weekends from Thursday afternoon until Monday morning, every Tuesday after school until 7 p.m., and on alternating Thursdays after school until Friday morning. Pickup and delivery were to take place at school, or at the West Hollywood Sheriff's station when the children were not in school. Mr. Condon could also enroll Henry in part-time daycare at his own expense.
[3] On December 7, 1995, the trial court issued an order giving Mr. Condon custody of the children for 10 days up to and including Christmas 1995, with visitation to Ms. Cooper. The trial court also ordered, pursuant to stipulation of the parties, the parties may record one another, telephonically, face-to-face, or otherwise, with or without notice.
[4] Mr. Condon's four custody periods would correspond to the Australian school calendar. In 1996, the breaks occurred from April 1 through 12, July 1 through 12, September 30 through October 11, and December 20 through January 31. Mr. Condon was also awarded physical custody in Australia for up to 15 days a month if he gave Ms. Cooper 2 weeks' notice.
[5] The court found the older son Bayard had spent two and a half of his seven years outside of California, and found no evidence of the children having local friends or acquaintances their own age in California.
[6] Spousal support would be reduced to zero if Ms. Cooper was still in Los Angeles on December 31, 1998.
[7] The court's order specified: "Petitioner shall pay all cost of transportation to transport the children from Australia to Los Angeles and return or to transport himself to Australia and return but may utilize the funds in the trust to do so. Any frequent flyer miles accumulated by the children shall be under the control of the petitioner to be utilized for the cost of travel of the children between Australia and Los Angeles and return. On any flight where an adult traveler is required to accompany one or both of the children, petitioner shall obtain or pay the cost of such accompanying traveler for the transportation from Australia to Los Angeles. Respondent shall obtain or pay the cost of the accompanying traveler from Los Angeles returning to Australia."
[8] A motion for reconsideration may only be considered before final judgment is entered and while the case is still pending in trial court. (Betz v. Pankow (1993) 16 Cal. App.4th 931, 937 [20 Cal. Rptr.2d 841].)
[9] Filed with Mr. Condon's motion for new trial were a declaration from his Australian solicitor Jonathan Harris raising as an issue the enforceability of the California custody and visitation order in an Australian court; a memorandum of advice from an Australian family law expert, Francis Grant, regarding the implications of a move-away order to Australia; and, a declaration and supporting materials from Dr. Len Bergantino regarding "Parental Alienation Syndrome."
[10] We recognize in an ordinary domestic child custody case the supporting parent's duty to pay child support remains even if the other parent fails to obey the custody and visitation provisions of the court's order. (Moffat v. Moffat (1980) 27 Cal.3d 645 [165 Cal. Rptr. 877, 612 P.2d 967] [obligation to pay child support is unaffected by custodial parent's interference with visitation].) The noncustodial parent instead is required to use other remedies, generally a court order compelling the custodial parent to obey the visitation arrangements or risk sanctions from the court. To allow noncustodial parents to unilaterally curtail child support payments would risk their children's well-being and in many cases impose the burden of their support on California taxpayers.

These considerations do not apply, however, when the custodial parent has moved to a foreign country. If the custodial parent disobeys the California visitation order and defies the jurisdiction of the California courts, the noncustodial parent lacks the ordinary remedy of seeking an enforceable motion to compel in the California courts.
Furthermore, since the children now reside in a country several thousand miles away, California taxpayers no longer bear the risk the loss of child support payments will leave them to the public dole.
Nonetheless, we offer this alternative remedy only as a last resort and then only if the noncustodial parent establishes to the California court's satisfaction the custodial parent is disobeying the custody and visitation orders that court imposed, and furthermore the foreign court has refused to enforce those California orders.
[11] This appeal is based upon a settled statement under California Rules of Court, rule 7. The settled statement was established by stipulation of the parties, and contains a narrative setting forth all trial testimony, reporter's transcripts for two trial days, the statement of intended decision, the judgment on bifurcated issues, and the other documents required by California Rules of Court, rule 7(c). The purpose of a settled statement is "to provide the appellate court with an adequate record from which to determine contentions of error." (In re Marriage of Fingert (1990) 221 Cal. App.3d 1575, 1580 [271 Cal. Rptr. 389], citing Maria P. v. Riles (1987) 43 Cal.3d 1281, 1296 [240 Cal. Rptr. 872, 743 P.2d 932].) Under the doctrine of "implied findings," when parties waive a statement of decision expressly or by not requesting one in a timely manner, appellate courts reviewing the appealed judgment must presume the trial court made all factual findings necessary to support the judgment for which there is substantial evidence. (See In re Marriage of Arceneaux (1990) 51 Cal.3d 1130 [275 Cal. Rptr. 797, 800 P.2d 1227]; Hogoboom & King, Cal. Practice Guide: Family Law 3 (The Rutter Group 1997) ¶ 16:215, p. 16-42.1.) The Court of Appeal in In re Marriage of Fingert rejected the doctrine of implied findings where a settled statement served as the record. (In re Marriage of Fingert, supra, 221 Cal. App.3d at p. 1580.) Because the instant case is, like Fingert, based upon a California Rules of Court, rule 7 settled statement, we need not presume all factual findings necessary to support the judgment were made.
[12] According to Family Code section 3003, "`[j]oint legal custody' means that both parents shall share the right and the responsibility to make decisions relating to the health, education, and welfare of a child." In their article, Wallerstein and Tanke, To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce (1996) 30 Fam. L.Q. 305, Dr. Judith Wallerstein and Attorney Tony Tanke concur with the notion that joint legal custody can be shared even if physical custody is changed as a result of relocation. (Id. at pp. 320-321.)
[13] A joint physical custody order does not require a child to spend an equal amount of time with each parent. (In re Marriage of Birnbaum (1989) 211 Cal. App.3d 1508, 1515 [260 Cal. Rptr. 210].) Hogoboom and King comment extended visitation at infrequent intervals may not be "reasonable" with regard to infants or toddlers: "from a developmental perspective, very young children should not be separated from their primary caretakers for long blocks of time." (Hogoboom & King, Cal. Practice Guide: Family Law 1, supra, ¶ 7:486.1, p. 7-132.) Yet these two boys are no longer "infants or toddlers" and presumably can maintain a valuable relationship with their father which comes in longer doses four times a year.
[14] Family Code section 3011 was amended in 1996, and this amendment became effective after the decision in the instant case. The 1996 amendment expanded the categories of abusers and recipients of abuse in subdivision (b), and added subdivision (d) which considers the "habitual or continual illegal use of controlled substances or habitual or continual abuse of alcohol by either parent." (Fam. Code, § 3011, subd. (d), as amended by Stats. 1996, ch. 835 (Assem. Bill No. 2474) and Stats. 1996 ch. 836 (Sen. Bill No. 384) § 1.5.)
[15] The court considered such factors as his physical violence, their mutual verbal violence, her drug taking and the amount of time the children spent with their father.
[16] Family Code section 3403 reads in part: "(a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if the conditions as set forth in any of the following paragraphs are met:

"(1) This state (A) is the home state of the child at the time of commencement of the proceeding, or (B) had been the child's home state within six months before commencement of the proceeding and the child is absent form this state because of removal or retention by a person claiming custody of the child or for other reasons, and a parent ... continues to live in this state.
"(2) It is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and the child's parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships."
[17] Family Code section 3414 provides in part: "(a) If a court of another state has made a custody decree, a court of this state shall not modify that decree unless (1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this part or has declined to assume jurisdiction to modify the decree and (2) the court of this state has jurisdiction."
[18] As the Kumar court noted, "Application of the provisions of section 5163 (now § 3414) to the instant case compels the conclusion that New York has continuing jurisdiction to modify its decree so long as [father] resides there and continues to assert and exercise his custody/visitation rights." (32 Cal.3d at p. 700; see also Bodenheimer, Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA (1981) 14 Fam. L.Q. 203, 214-215.)
[19] The Parental Kidnapping Prevention Act (28 U.S.C. § 1738A(d)) states that "[t]he jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant."
[20] Family Code section 3424 reads: "The general policies of this part extend to the international area. The provisions of this part relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons."
[21] Article 1 of the Hague Convention reads: "The objects of the present Convention are  [¶] . . [¶] b to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." (Hague Convention, supra, 19 Intl. Legal Materials at p. 1501)
[22] Article 12 of the Hague Convention states: "Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return forthwith. The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." (Hague Convention, supra, 19 Intl. Legal Materials at p. 1502, Italics added.)

Even under the Hague Convention, the court of the requested state (here Australia) is not bound to order the return of the child if the person opposing its return establishes the parent requesting return "was not actually exercising the custody rights at the time of the removal or retention, or had consented to or subsequently acquiesced in the removal or retention" or "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." (Hague Convention, supra, Intl. Legal Materials, art. 13, §§ a & b, p. 1502.)
[23] Regulation 16 of the Australian Family Law (Child Abduction Convention) Regulations 1986 (Cth) reads as follows:

"(1) Subject to subregulations (2) and (3), on application under regulation 14, a court must make an order for the return of a child:
"(a) if the day on which the application was filed is less than 1 year after the day on which the child was removed to, or first retained in, Australia; or
"(b) if the day on which the application was filed was at least 1 year after the day on which the child was removed to, or first retained in, Australia unless the court is satisfied that the child is settled in his or her new environment.
"(2) A court must refuse to make an order under subregulation (1) if it is satisfied that:
"(a) the removal or retention of the child was not a removal or retention of the child within the meaning of these Regulations; [¶] ... [¶]
"(3) A court may refuse to make an order under subregulation (1) if a person opposing return establishes that:
"(a) the person, institution or other body making application for return of a child under regulation 13:
"(i) was not actually exercising rights of custody when the child was removed to, or first retained in, Australia and those rights would not have been exercised if the child had not been so removed or retained; or
"(ii) had consented or subsequently acquiesced in the child being removed to, or retained in, Australia; or
"(b) there is a grave risk that the return of the child to the country in which he or she habitually resided immediately before the removal or retention would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation; or
"(c) the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views; or
"(d) the return of the child would not be permitted by the fundamental principles of Australia relating to the protection of human rights and fundamental freedoms.
"(4) For the purposes of subregulation (3), the court must take into account any information relating to the social background of the child that is provided by the Central Authority or other competent authority of the country in which the child habitually resided immediately before his or her removal or retention.
"(5) The court to which an application for the return of a child is made is not precluded from making an order for the return of a child to the country in which he or she habitually resided immediately before his or her removal or retention only because a matter mentioned in subregulation (3) is established by a party opposing return."
[24] Furthermore, Family Law Regulation 23(8) states that "[n]othing in this regulation precludes a court having jurisdiction under the Act from receiving evidence of an order made in any overseas jurisdiction (whether or not such jurisdiction is a prescribed overseas jurisdiction) that gives a person the right to have a child live with him or her, or the right of custody of, access to or contact with, the child."
[25] The Family Law Reform Act 1995 (Cth) went into effect on June 11, 1996. The Reform Act fundamentally changed the Family Law Act 1975 (Cth), especially with regard to the concepts of custody and access. (The Laws of Australia: Family Law (1993) Guardianship, Custody and Access, § 17.7, ¶ 2.) Following the lead of the Children Act 1989 (UK), instead of custody orders, Australian courts now issue parenting orders, which are further broken down into residence orders, contact orders, and child maintenance orders. (Ibid.) The stated purpose behind the change is to "displace concepts of custody and access which `carry ownership notions' and which may lead to `the belief that the child is a possession of the parent who is granted custody.'" (Ibid.) There are not many reported decisions interpreting the new statutory language.
[26] Section 70J(1)(b) replaced section 68(3)(b), which read: "Where an overseas custody order is so registered, a court in Australia shall not, where it becomes aware of the order, exercise jurisdiction ... unless: [¶] ...

"(b) the court is satisfied that there are substantial grounds for believing that the welfare of the child will be adversely affected if the court does not exercise jurisdiction in the proceedings." (Italics added.)
The Full Court of the Australian Family Court declined to interpret the difference between "must not exercise" and "shall not exercise," or "child's welfare requires" and "child's welfare will be adversely affected" in the case of In the Marriage of Domroese and Leggett (1996) 20 Fam. L.R. 213, other than to say that the court would have a "slightly different responsibility."
[27] Prior to oral argument in this case we asked the parties to address the issue whether the California court's order regarding custody and visitation was enforceable in perpetuity under Australian law, international treaties or agreements.
[28] There was evidence in the trial court Ms. Cooper was a very successful artist in her native country and furthermore that she had opportunities to advance her career in France.