Filed 4/22/13  In re E.A. CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re E.A., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Y.A., <br><br> Defendant and Appellant. | A136944 <br><br> (San Mateo County Super. Ct. No. 82483) |

San Mateo County Human Services Agency Children and Family Services (the agency) filed a petition pursuant to section 300, subdivision (b) of the Welfare and Institutions Code[1] on behalf of E.A.  The petition alleged that Y.A. (mother) was unable to care for E.A. because of mother's alcohol abuse.  The petition also alleged that E.A.'s father, M.A. (father), lived in Palestine.  Father informed the agency that he wanted custody of E.A. and at the dispositional hearing the court removed E.A. from mother and ordered E.A. to be placed with her father in Palestine.  The court stayed the order until the necessary documents and arrangements could be made for E.A. to travel to Palestine.  The court also ordered visitation with mother and E.A. to be arranged by the parents.

---

[1]  All further unspecified code sections refer to the Welfare and Institutions Code.

1

On appeal, mother argues that the visitation order was inadequate because it did not specify the amount of visitation or how it would be provided. She also objects to the transfer of E.A. to father's home in Palestine and the juvenile court's denial of her request to continue the dispositional hearing. She maintains that the court did not have sufficient information regarding E.A.'s home in Palestine, as there was no home check, or the specialized education or services available to E.A.

We agree that the visitation order is insufficiently specific, as it needs to set forth the minimum number of hours of visitation per week or month and whether all of the visitation will be telephonic. If some of the visits are to be in person rather than by telephone or video, the court needs to set forth how such visits will be facilitated and who is to be responsible for paying for these visits. We reject mother's other challenges to the juvenile court's orders. We conclude that the juvenile court did not abuse its discretion when it terminated dependency jurisdiction, granted father legal and physical custody of E.A., ordered E.A. transferred to Palestine, and issued a stay of the order until E.A. is on a plane to Palestine. Accordingly, we reverse the visitation order, but otherwise affirm all of the juvenile court's orders.

## BACKGROUND

### *The Petition and Detention*

On August 14, 2012, the agency filed a petition pursuant to section 300, subdivision (b) on behalf of E.A. The petition alleged that the child was not quite 10 years old and that mother was unable to provide regular care for her daughter due to mother's abuse of alcohol. It further alleged that the agency had provided mother with voluntary services in the past but she had continued to test positive for various drugs and alcohol. On July 4, 2012, the police stopped mother while she was driving and she had a 0.18 blood alcohol content; mother had prior convictions for driving under the influence. Mother had failed to complete an alcohol/drug assessment or enroll in alcohol/treatment services and also had failed to secure stable housing or counseling services for her daughter. Additionally, mother had pinched E.A., resulting in a bruise on at least one

2

occasion. On March 21, 2012, mother had been placed on a psychiatric hold due to her intoxication and suicidal statements.

With regard to E.A.'s father, the petition stated that he resided in Palestine with E.A.'s twin brother. He had been unable to obtain a visa in order to travel to the United States to arrange care for E.A.

The agency filed its detention report on August 14, 2012. Prior to the filing of this petition, E.A., according to the report, had been the subject of four referrals since 2010. All of the referrals related to mother's alcohol abuse and neglect of E.A.

The report indicated that mother told the social worker that she married father in Palestine and father and she "never technically got divorced." She had not seen father in six years.

A referral to the agency made on June 11, 2012, triggered the filing of the current petition. On this date, mother, according to the report, was in the hospital for unknown reasons and had not made any arrangements for the care of E.A. The referent told the social worker that on June 9, 2012, mother, while drunk, pinched E.A. during a struggle between mother and child. The social worker observed a small bruise on the child's arm. The child, according to the report, asserted that she saw her mother drink from different bottles all day and that her mother hurt her by hitting her on the back of her head and pinching her. The child expressed a desire to be with her stepfather (mother's former fiancé) or her maternal grandparents.

The detention hearing was held on August 15, 2012. Mother's counsel stated that mother was submitting on detention but was concerned about the placement of E.A. The maternal grandmother[2] was at the hearing and the court considered placing E.A. with her. The maternal grandmother informed the court that she was supposed to leave for Palestine but had remained only to make sure that E.A. "is in good condition, in good, safe hands." She stated that she did not want E.A. to be placed in a foster home. After

---

[2] She was mother's stepmother and thus, actually, E.A.'s maternal step-grandmother.

further discussion, the court adopted the agency's recommendation to have E.A. remain in the home of Rita R., the mother of mother's former fiancé.

### *The Jurisdictional/Dispositional Hearing*

On August 31, 2012, the agency filed its jurisdictional/dispositional report. The social worker spoke to E.A. on August 22, 2012, and she reported that her mother was "drunk all of the time." She asserted that her mother pinched her and pulled her hair.

On August 27, 2012, the social worker made a telephone call to father in Palestine. Father confirmed that he knew that mother had been abusing alcohol and not providing care for E.A. He reported that he was unable to get his visa to come to the United States to get his daughter but that he would "love to have her." He stated that his green card had been revoked in 2010 because he did not know that his visa needed to be renewed every six months.

Mother told the social worker that she moved to Palestine in July 1999 to reside with her grandparents. She became engaged in October 1999, and married father in May 2000. She stated that father "is extremely well to do and the family owns a factory in Palestine." In 2006, mother, father, E.A., and her twin brother, moved to California with the hope of establishing a business. After two months, father decided that the business was not doing well and that they should return to Palestine. Mother did not want to return because of the war there and the "limitations" on her life. Mother remained in the United States with both children, and father moved back to Palestine. In 2007, father visited the United States and asked if he could take the son back with him; mother said that he promised to return the child. Mother stated that he never returned the child. In 2008, mother tried to go to Palestine to get her son, but she had violated a visa in 1999 and was unable to enter the county.

With regard to her drinking, mother said that she began drinking at the age of 24, and was a bartender for approximately five years. She stated that her drinking became a problem approximately one year ago when she lost her bartending job. Mother acknowledged her drinking problem and asserted that she wanted to get better and have E.A. returned to her care. On August 29, 2012, mother called the social worker and

4

maintained that it would be best for E.A. if she went with her father in Palestine and that he would take good care of her.

Father, according to the report, said that he was born in Palestine and that he married mother in 2000. They remained in Palestine until 2006, and mother, according to father, was an ideal mother while in Palestine. He confirmed that they moved to the United States in 2006, and that he wanted to move back to Palestine after about four months. He noted that mother wanted to remain in the United States. He claimed that he asked to take both children back to Palestine with him but mother would not permit that. A year later he returned to the United States for a visit and again requested to take the children. Mother, according to father, permitted him to take only their son because she "loved the girl more." He proclaimed that he had visited E.A. and had talked to her on the telephone. He indicated that mother limited his access to E.A. after he expressed concern about mother's care of E.A. He told the social worker on August 27, 2012, that he wanted E.A. to live with him and that he had a four-bedroom home and would be able to provide a therapist for her.

On August 22, 2012, the social worker spoke to E.A. She divulged that she did not like living with her mother. She said that it would be hard to pick between her father and her mother's former fiancé. She also noted that she did not speak Arabic, (i.e., knew only one word), and that she had her homework and Netflix in the United States. She reported that her father treated her well and that in Palestine she would have her brother, father, her room, and her family. She said that she did not want to see her mother because she did not treat her well. The report indicated that E.A. was receiving speech therapy through the school district and that she was "slightly developmentally delayed."

The agency recommended that E.A. be declared a dependent of the court and that both mother and father be offered reunification services. The agency also recommended that the child be detained in the home of Rita and Rita's son, mother's former fiancé.

The agency filed an addendum report on September 17, 2012. The report revealed that mother had been residing at the Shelter Network (the shelter) and had participated in an alcohol and other drug assessment. The recommendation of the assessment was for

mother to enter and complete a residential treatment program. Mother registered for the program but did not enter into the program.

The social worker supervised a visit between E.A. and mother on September 12, 2012. Mother was extremely affectionate and hugged and kissed the child throughout the visit. Mother was "extremely encouraging and helpful" in having the child complete her homework.

The agency filed a second addendum report on September 19, 2012. The report stated that mother mentioned on September 17, 2012, that she was not sure whether she would be permitted to remain at the shelter because she had been late on her curfew twice. She admitted that she had been drinking alcohol with her boyfriend outside the shelter on September 15, 2012, which was reported to the shelter. The shelter conducted a breathalyzer test on her; mother failed it. On September 19, 2012, mother confirmed that she was no longer allowed to stay at the shelter.

The social worker contacted the case manager for mother at the shelter. The case manager disclosed that mother had been late on three nights and had failed the breathalyzer tests. Mother appealed the decision to dismiss her from the shelter and indicated that she had obtained employment and potential housing with her boyfriend. Mother asked if she could return to the shelter and was permitted to do so. Mother again returned later than expected, her breath smelled of alcohol, and she did not pass the breathalyzer test.

In this second addendum report, the agency recommended that E.A. be declared a dependent of the court. It stated that both mother and father would be offered reunification services.

On September 20, 2012, the juvenile court held the uncontested jurisdictional hearing. Father appeared telephonically and was assisted by an Arabic interpreter. Counsel for mother reported that she received a voicemail that morning indicating that mother had been taken into custody the night before; thus, mother was not present for the hearing. Father's counsel indicated that he was going to contest disposition. Father's attorney stated that the primary issue was placement of the child and mother's counsel

6

commented that the last time she had spoken to mother "she was in agreement with the father's request." The attorney for the child interjected that his client "is pretty opposed to the idea. Doesn't speak the language. Hasn't seen bio dad in a very, very long time. It's not a relationship." Counsel added that it would be "ideal" if father and daughter could get to know each other first.

E.A. indicated that she did not want to see her father on the computer when talking to him, but the court still ruled that Skype should be set up to permit E.A. and father to see each other when they talked. The court continued the jurisdictional hearing to be held with the contested dispositional hearing.

The agency filed its third addendum on October 17, 2012. The agency stated that E.A. was happy at Rita's home and appeared to be doing well. E.A. told the social worker on several occasions that she enjoyed residing with Rita; she also told her that she would like to go to Palestine to be with her father and brother. E.A. repeated that she did not want to live with her mother. According to the teacher and speech pathologist for E.A., she had been telling everyone at school that she was moving to Palestine. Both the teacher and speech pathologist emphasized that it was important that E.A. continue to receive specialized education and speech therapy. E.A. was performing at a 1.6 grade level due to her learning disability and speech problem. Additionally, there had been "chaos" in E.A.'s prior school year but she was now improving significantly. Mother had stated that there were no resources in Palestine to address E.A.'s needs but father claimed that E.A. would attend an American school in Palestine where there was "an abundance of resources available."

The report indicated that mother continued to struggle with her alcohol addiction and continued to be homeless. She was living with her boyfriend in his car. Mother had not provided any toxicology tests, and was refusing to get tested. According to the agency's report, when asked whether she still wanted E.A. to live with her father in Palestine, mother responded: " 'No, not anymore. I was planning on going there, but now, I am not going to go, so I don't want her to go either. . . . If she leaves the country, I will never see my daughter again. I can't go unless I finish up everything that is going

on here.  If she is here, at least I can see her once a week.  I want her to know that I am her mother.' "

The agency's report stated that father had "been extremely compliant through the course of the investigation" and consistently confirmed that he wanted E.A. to live with him in Palestine.  He insisted that he was willing to do whatever was necessary to ensure that she would have a nurturing environment.  Father stated that E.A.'s twin brother was currently attending an American private school in Palestine and the majority of the teachers were English speaking and from the United States.  He asserted that if the school did not have specialized education services, he would hire a private speech therapist and teacher to assist E.A. with her learning disability.

Father was having difficulty setting up the Skype contact with E.A., but he was calling E.A. on the phone.  The first Skype contact was on October 10, 2012, and they were continuing to Skype multiple times throughout the week.  E.A. also had Skype contact with her twin brother.  Father showed E.A. the house and the bedroom he had prepared for her.  E.A. told the social worker that she was excited to see her family in Palestine.

The agency also spoke with the maternal grandfather who was living in Palestine.  He opined that it was essential that E.A. live with father.  He maintained that there were special schools in Palestine and that father could hire tutors to assist E.A.

The agency concluded that father had been actively making efforts to have E.A. returned to him.  The report provided the following:  "Any request that the [social worker] has made, the father has immediately responded.  The father sent $200 via Western Union immediately, he had a document notarized, he established a Skype account, the father has contacted the [social worker] many times to ensure that the [social worker] received all of the documents [that] were requested.  The father has expressed concern about [E.A.'s] emotional health and has asked the [social worker] to not disclose information about the mother to [E.A.] which may 'hurt her.'  The father has also requested that [E.A.] leave the courtroom when the discussion of the mother is raised.  The father has stressed the desire of having his daughter return to him and his son."

8

The agency recommended that physical and legal custody of E.A. be granted solely to father pursuant to section 361.2, and that E.A.'s dependency status be terminated.

On October 19, 2012, the agency filed a second amended petition. The second amended dependency petition deleted the jurisdictional allegations against father.

The juvenile court held the jurisdictional/dispositional hearing on October 19, 2012. Father appeared via video and was assisted by an Arabic interpreter. Before going on the record, mother's counsel requested a continuance because of the late notice of the agency's change in position. The court denied this request.

Mother submitted on the amended petition for jurisdiction and waived her rights. The court found the amended petition true.

Maryam Adalat, the social worker for the agency, testified. She acknowledged that the current caregivers of E.A., Rita and her son, were excellent. She stated that mother had not been testing, was homeless after being told to leave the shelter, and was not willing to go into treatment. Since mother was not making any progress, she was concerned that E.A. would not be able to live with mother.

In addition to mother's lack of progress, Adalat stated that the agency changed its recommendation to have E.A. live with father in Palestine because father wanted his daughter back and had been "extremely compliant." She admitted that no one from the agency had been to father's home to check it. She explained that the agency would ordinarily have another agency check father's home if he were living in another state in the United States, but such a check was not mandatory because he was not an offending parent.

Adalat acknowledged that mother was loving and affectionate when she visited with E.A. E.A., however, told Adalat that she did not want to be around her mother.

Adalat admitted that she first did not recommend placement with father because he had not been the caregiver for the last six years and had little contact with E.A. That condition had not changed, although father was having more contact through Skype. Adalat testified that E.A. told her that she was not sure whether she would select her

9

father or her current placement if given the choice, but she definitely did not want to be with her mother. Currently, according to Adalat, E.A. was telling her that she wanted to go live with her father in Palestine. She said that she wanted to be with her father, brother, and grandfather. Adalat admitted that E.A. could not be removed from father's home in Palestine if the situation did not go well. She conceded that there was a risk but stressed that father was the nonoffending parent. She also agreed that E.A. was doing well this year and that she had concerns about removing her from her current setting.

Adalat testified that the maternal grandmother and maternal grandfather told her that the schools were great and father also assured her that he could get a speech therapist and a mental health service provider for E.A. if needed. She noted that E.A. was in the fifth grade but testing at the 1.6 grade level. Adalat looked at the website for the school that E.A. would be attending but she could not find much information about special education. Father had not yet had a chance to investigate special services at the school because he had been busy trying to obtain E.A.'s birth certificate. She emphasized that father was willing to hire a tutor or a therapist if services at the school were not available.

Since E.A. had been detained on August 15, 2012, she had spoken to father, according to Adalat, more than 10 times but less than 20. In all of the conversations, father expressed his desire to have E.A. live with him. Adalat did not have any concerns regarding his ability to meet E.A.'s needs and did not believe that there was any detriment in having E.A. live with her father.

When doing the risk assessment, Adalat spoke to the maternal grandmother, who is not Palestinian. The grandmother told Adalat that she believed E.A. would be safe and happy in Palestine. She acknowledged that there were cultural differences but the grandmother insisted that women were respected. She asserted that within their community most of the restrictions were related to safety. The grandmother had traveled many times to Palestine and had visited father's home. Adalat stated that she also talked to the maternal grandfather, and he confirmed what the grandmother had said. He said that his wife and he would stay in Palestine to help E.A. adjust.

10

Adalat testified that she also spoke to the current caregivers of E.A., Rita and mother's former boyfriend, as they had been in contact with father. They declared that he had been "great" and had been "an excellent support" for E.A.

Father testified that he wanted E.A. to come live with him and that he had the resources to meet her needs. He informed the court that he had visited the school where E.A. would be going and spoke with the principal. Father insisted that the school was excellent, that it had 15 American teachers and 15 Arabic teachers, and that there was an after-school program to help tutor E.A. in language. If the school could not meet E.A.'s special needs, he stressed that he was prepared to hire a therapist.

Father revealed his recent marriage and disclosed that his wife was sitting with him. He declared that his wife supported E.A.'s coming to live with them.

The court then heard argument from counsel. The attorney for E.A. stated that he had "grave concerns." He maintained that even if it were the right answer for E.A. to be with her father in Palestine, placing her there now was premature. He believed there was a detriment at this point in time to satisfy section 361.2. Counsel expressed concern about placing E.A. with the nonoffending parent when the parent was living in a country "that we know very little about." He added that father had not "checked out some things regarding what [E.A.] desperately needs, which is special help in every respect . . . . And he hasn't inquired if there is a special ed[ucation] teacher there, trained to deal with children that are delayed. He doesn't have a therapist lined up. Hopefully, there are therapists nearby. I'm not convinced of that. It would be great to know that and have some communication begun with that person who's going to be working with [E.A.]." He stressed that E.A. was now working with people and she was flourishing and that he "would hate to see her move into a situation where she's going to stagnate or not have that special help that she needs in order to develop into an adult."

Counsel for E.A. suggested that the court take jurisdiction and continue the case for further disposition and then the social workers could visit father's home and the school in Palestine. During that time, E.A. could study some rudimentary Arabic. He also had apprehension over the court's learning that father had just married and nothing

11

was known about father's new wife. He concluded: "But combine that with the fact that it's been six years since there's been contact, there is just a tremendous amount of concerns that amount to detriment at this point."

At the end of the hearing, the juvenile court ruled as follows: "Nobody likes to take away a child from a parent, but I'm really bound by the presumption, or the clear and convincing evidence, that the placement would be detrimental to her safety, protection, or physical or emotional well-being. [¶] And while [the attorneys for E.A. and mother] have concerns about that, and there are some concerns, but that standard has not been met." The court concluded that the concerns did not establish detriment and the attorneys' concerns were "sort of speculation." The court found that father "was a very credible witness" and observed that he was "going to be a very loving parent, who [was] going to do everything possible for his daughter." The court granted father sole physical and legal custody, and stated that dependency would be terminated once E.A. was transported to Palestine. The court noted that dependency would remain open until the transfer with "the same supervision and the same living situation" that she currently had. The court ordered maternal grandfather to transport E.A. to Palestine.

The minute order of the hearing on October 19, 2012, stated that sole physical and legal custody of E.A. was granted to father pursuant to section 361.2. The order provided that E.A.'s dependency status was terminated and that this order was stayed "until child is on the plane to Palestine."

### Notice of Appeal and Motion for Reconsideration

On October 19, 2012, mother filed a notice of appeal from the order of this same date, which closed the dependency proceeding and gave custody of E.A. to father. Five days later, on October 24, 2012, mother filed a motion for reconsideration and for a stay. Father and the agency separately filed opposition to mother's motion for reconsideration.

The agency filed an addendum report on October 25, 2012. The reported indicated that mother had missed two supervised visits with E.A. and refused to participate in testing. The maternal grandmother told the social worker that she was moving to Palestine to help with E.A.'s transition. She reported that she believed that

12

father would be "the best father." She told the social worker that E.A. was "very happy and excited about going to Palestine."

The juvenile court held a hearing on October 26, 2012.[3] Father appeared and maternal grandfather acted as the interpreter. Counsel for mother raised various arguments but presented no new evidence. Counsel for father asserted that mother had presented no new evidence or any change in circumstances. Counsel for E.A. argued that the child's best interest was the most important consideration and that no investigation had been done of father's home and father had a brand new wife who had not been interviewed. Additionally, there had been an inadequate investigation into the special education services and there was the issue that E.A. did not speak Arabic. Counsel maintained: "It is detrimental—all of those things are detrimental to the child if any of those things turn out to be problematic and there is nothing we can do about it once she leaves."

At the end of the hearing, the juvenile court stated: "[I]n my view there is no new evidence to the mother's benefit that would cause me to want to change my order. But even if I could completely reopen the hearing and take in all the evidence, including what is known now about the maternal grandmother, mother's refusal to test, mother's missing visits, it is very clear to me that the best interest of this child would be to be with the father." The court denied the motion for reconsideration and the request for a stay.

The court signed the custody order and final judgment on October 26, 2012, which stated that E.A. was to live with father and that he had legal and physical custody of E.A. The order indicated visitation for mother and that it was to be arranged by the parents.

On November 13, 2012, mother filed her supplemental notice of appeal. On this same date, she also filed a petition for writ of supersedeas and requested a stay. Two days later, on November 15, mother filed for temporary orders pending determination of the petition for writ of supersedeas and the request for a stay. We granted this application for temporary orders. Father applied for permission to file opposition, which we granted.

---

[3] The reporter's transcript incorrectly states November 26, 2012.

13

The agency and father separately filed opposition to mother's writ. On November 29, 2012, we summarily denied mother's writ of supersedeas. We denied her second petition for writ of supersedeas and request for an immediate stay on April 19, 2013. Subsequently, we granted mother's unopposed request for judicial notice.

## DISCUSSION

### I. *Visitation*

Mother challenges the juvenile court's ruling that mother may visit E.A. "[a]s arranged by the parents." She argues that the court should have provided standards for how the visitation would be provided given that mother was homeless and without resources and that E.A. was being placed with her father in Palestine.

Section 361.2, subdivision (b)(1) states that the court "may" when ordering the nonoffending parent with legal and physical custody of the child "provide reasonable visitation by the noncustodial parent."[4] If the court "terminates its jurisdiction," it "may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4.) In making any custody or visitation order, the juvenile court must always consider the best interests of the minor. (*In re John W.* (1996) 41 Cal.App.4th 961, 973, superseded by statute on another issue.) Section 362.4 authorizes the juvenile court " 'to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.' " (*In re Chantal S.* (1996) 13 Cal.4th 196, 203.) Such an order is commonly referred to as an "exit order." (*In re John W.,* at p. 970, fn. 13.)

"We review an order setting visitation for abuse of discretion. [Citation.]" (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to

---

**4** "[N]oncustodial parent" means the parent "with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300." (§ 361.2, subd. (a).)

14

substitute its decision for that of the trial court.' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

On appeal, mother maintains that she did not forfeit her challenge to the visitation order because in the lower court she argued that placement with father would deny her any real possibility of visitation and she would be essentially without a remedy because E.A. would be in Palestine. Mother, however, did not specifically object below on the basis that the visitation order was too vague or that it improperly failed to specify the frequency or duration of her visits with E.A.

"In dependency litigation, nonjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal." (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.) An appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. (*In re. S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on other grounds.) In dependency cases, however, discretion to consider forfeited claims "must be exercised with special care[,]" "[b]ecause these proceedings involve the well-being of children[.]" (*Ibid.*) The overriding issue should remain consideration of the child's best interests.

Here, the alleged defect in the visitation order is a question of law. When a visitation order is inadequate, it could lead to unnecessary conflict between the parents. This conflict could ultimately deprive E.A. of continued contact with her mother. Since mother raises an important legal issue and the interests of justice weigh in favor of consideration, we will exercise our discretion to consider the visitation order. (See *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1267.)

A visitation order "necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child. In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) If a juvenile court "grants visitation, 'it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact

15

occur.' [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.) "[B]y failing to mandate any minimum number of monitored visits [within a stated period of time], the court's abstract recognition of [a parent's] right to visitation is illusory . . . ." (*In re S.H.* (2003) 111 Cal.App.4th 310, 319; see also *In re Hunter S.,* at p. 1505 [a child may not be allowed to control whether visitation occurs]; *In re Chantal S., supra,* 13 Cal.4th at p. 213 [a juvenile court abuses its discretion when it delegates to a third party the complete authority to decide whether visitation takes place].)

The power to determine the right and extent of visitation by a noncustodial parent in a dependency case, including orders issued when the dependency case is terminated, resides with the juvenile court and may not be delegated to nonjudicial officials or private parties. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476.) In *In re T.H.* (2010) 190 Cal.App.4th 1119, the juvenile court terminated dependency jurisdiction and issued an exit order allowing supervised visitation by father " 'to be determined by the parents.' " (*Id.* at p. 1122.) In holding that the lower court abused its discretion in issuing this visitation order, Division Five of this court explained that the rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated. (*Id.* at p. 1123.) A visitation order that states that visitation is "to be determined by the parents," does more than simply delegate ministerial tasks, such as the "authority to set the 'time, place, and manner' of the visitation—it effectively delegates to mother the power to determine whether visitation will occur at all." (*Ibid.*) The appellate court noted that the record demonstrated the inability of the parents to get along, suggesting that any agreement regarding visitation would be difficult to achieve. (*Ibid.*) Division Five concluded that the lower court abused its discretion by structuring the visitation order in a manner that provided the mother with essentially veto power over father's right to visitation. (*Id.* at p. 1124.)

Here, similarly to the trial court in *In re T.H., supra,* 190 Cal.App.4th 1119, the juvenile court framed the visitation order to give father veto power over mother's right to visitation; thus her right to visitation is illusory. The order stated that mother's visitation with E.A. was to occur "[a]s arranged by the parents." The order does not specify

16

whether the visits are to be in person or by telephone; it does not set forth a minimum number of telephonic and/or in-person visits; and it does not mandate the length of time for each visit. Furthermore, if the court intended to require in-person visits, it did not provide any information on whether E.A. was to travel to the United States or whether mother was to travel to Palestine and whether father should pay for these trips. The court could properly leave the details, such as the time or day, to the parents, but it should have set forth the minimum number of visits per week or month, the minimum amount of time the visits should last, and whether such visitation was to be solely by phone or video. If the court rules that the phone visits are to be supplemented with in-person visits, the court must detail the number and length of these visits and how they are to be facilitated.

The agency stresses that when ordering legal and physical custody of the child to the nonoffending custodial parent the only requirement under section 361.2, subdivision (b)(1) is that the court order "reasonable" visitation to the other parent. Additionally, California Rules of Court, rule 5.695(a)(7)(A) provides that a court at a disposition hearing may remove physical custody from the parent and "[a]fter stating on the record or in writing the factual basis for the order, order custody to the noncustodial parent, terminate jurisdiction, and direct that *Custody Order—Juvenile—Final Judgment* (form JV-200) be prepared and filed under rule 5.700[.]" Here, the court ordered visitation pursuant to section 361.2, subdivision (b)(1), and checked the box on the Judicial Council form that stated mother may visit the child "[a]s arranged by the parents." The agency argues that the court's order was therefore sufficient.

As already discussed, this visitation order was legally inadequate. The court did not order "reasonable" visitation as the order of visitation was illusory. The court could not delegate to father the power to determine whether any visits would occur and, if so, their frequency and duration. (See *In re Chantal S., supra,* 13 Cal.4th at pp. 213-214; *In re T.H., supra,* 190 Cal.App.4th at p. 1122.)

The agency also argues that the order was sufficient because father testified that he would pay for an airplane ticket for mother to visit E.A. Furthermore, the agency points

out that mother could seek relief in the family court if father fails to cooperate with the visitation order.

Father did indicate that he would consider paying for a plane ticket for mother to see E.A., but it is completely unclear whether he would do this one time or multiple times. Furthermore, there was no promise from father about having E.A. have telephonic contact with mother, which is of paramount importance in a situation where the child is moving to a foreign country and the costs and visa restrictions may bar any possible in-person contact.

We disagree with mother to the extent that she relies on *In re Marriage of Condon* (1998) 62 Cal.App.4th 533 (*Condon*) and *In re Karla C., supra,* 186 Cal.App.4th 1236 to argue that the juvenile court must ensure that visitation will, in fact, occur. In *Condon,* the parents had been temporarily awarded joint legal and physical custody of the two children in a dissolution case and the mother wished to return to her native Australia with her two children. (*Id.* at pp. 536-541, 550.) The trial court issued a custody order providing that the children would spend the school year with their mother in Australia and their vacation periods with their father in California. (*Id.* at p. 540.) The appellate court held that the trial court needed to take steps to ensure its orders would remain enforceable in Australia. (*Id.* at pp. 547-548.)

*Condon, supra,* 62 Cal.App.4th 533 is clearly distinguishable from the present case as it was not a dependency case and the children had not been removed from one parent's home. Thus, in *Condon,* "protective measures were necessary to ensure the nonmoving parent's continuing custody or visitation rights." (See *In re Karla C., supra,* 186 Cal.App.4th at p. 1266 [distinguishing *Condon* and other family law custody cases involving international relocation from dependency proceedings].) In contrast, here, the issue is mother's visitation rights once E.A. is in Palestine and the court could have issued an order granting mother no visitation. Additionally, dependency was terminated and the juvenile court has no continuing authority with regard to visitation.

*In re Karla C., supra,* 186 Cal.App.4th 1236 is also unavailing. In *In re Karla C.*, the juvenile court *retained* dependency jurisdiction, and was required to take measures to

18

ensure compliance with its orders while it retained jurisdiction. In the present case, the juvenile court terminated jurisdiction and any problem that develops regarding visitation can be raised in the family court. If we were to adopt the argument urged by mother, juvenile courts would be reluctant to ever offer visitation in situations, like the present, where enforcement of the visitation order in the foreign country cannot be assured and placement with the nonoffending parent in the foreign country is in the child's best interest.

Mother maintains that "[a]n unenforceable order is no order at all, and thus is void." (*Condon, supra,* 62 Cal.App.4th at p. 562.) The visitation order is not unenforceable or void in the United States, and the juvenile court is in the best position to assess whether it is likely that the nonoffending parent will follow the court's orders and act in the child's best interests. Here, the record supports the juvenile court's implied finding that father would not prevent mother from visiting E.A. and would act in a manner consistent with E.A.'s best interests. The juvenile court found father to be credible and committed to the best interests of E.A. The social worker testified that father had complied with all of her requests and had demonstrated a commitment to E.A.'s best interests. Nothing in this record suggests that father would refuse to comply with a visitation order. We agree, however, that if the court orders visitation other than telephonic visitation, it should address how such visitation should be facilitated.

Accordingly, we reverse the juvenile court's visitation order and remand for the juvenile court to specify the minimum number of visits, the minimum duration of the visits, and whether the visitation is to be by telephone, in person, or both. If in person, the court should set forth how this visitation should be facilitated.

## II. *Placement with Father*

Mother does not contest the order removing E.A. from her custody and does not argue that she could reunify with E.A. Instead mother challenges the juvenile court's decision to terminate jurisdiction and place E.A. with father.

The juvenile court at the dispositional hearing has broad discretion to make custody orders when it terminates jurisdiction in a dependency case. (§ 361.2, subd. (b);

*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)  Thus, we review the trial court's decision to terminate jurisdiction and issue a custody order for abuse of discretion.  (*Nada,* at p. 1179.)

"When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a [noncustodial] parent . . . who desires to assume custody of the child.  If that parent requests custody, the court *shall* place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."  (§ 361.2, subd. (a), italics added.)  Section 361.2, subdivision (a), evidences "the Legislative preference for placement with [the noncustodial] parent . . . ."  (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1132.)

"[A] nonoffending parent has a constitutionally protected interest in assuming physical custody, as well as a statutory right to do so, in the absence of clear and convincing evidence that the parent's choices will be 'detrimental to the safety, protection, or physical or emotional well-being of the child.'  [Citations.]"  (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 697.)  The juvenile court must make the detriment finding by clear and convincing evidence and we review this evidence in the light most favorable to the court's decision to determine whether substantial evidence supports the lower court's ruling.  (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569-1570.)

Section 361.2, subdivision (b) gives the juvenile court three choices once it decides to place children with a noncustodial parent.  First, as the court did here, it may make custody and visitation orders, to be filed in family court, and terminate dependency jurisdiction.  (§ 361.2, subd. (b)(1).)  Second, the court may retain dependency jurisdiction and require the agency to conduct a home visit within three months, after which the court may proceed pursuant to any of the three options in section 361.2, subdivision (b).  (§ 361.2, subd. (b)(2).)  Third, the court may retain dependency jurisdiction and order services for either parent or both parents, and if it orders services for both, it may make a custody determination at a review hearing.  (§ 361.2, subd. (b)(3).)

20

In the present case, the record supported the juvenile court's finding that E.A.'s placement with father would not be detrimental to her safety, protection, or physical or emotional well-being. When first contacted by the social worker on August 27, 2012, father stated that he was unable to get his visa to come to the United States but that he would "love to have" his daughter. He stated that he wanted E.A. to live with him and that he had a four-bedroom home. He also said that he would provide a therapist for her, if needed. According to father, he wanted to have both of his children live with him, but mother refused to permit E.A. to accompany him back to Palestine. He told the social worker that he was willing to do whatever was necessary to ensure that E.A. would have a nurturing environment. He maintained that if the American private school in Palestine that E.A. was to attend did not have specialized education services, he would hire a private speech therapist and teacher to assist E.A. with her learning disability.

Additionally, father demonstrated a concern for E.A.'s emotional health. He told the social worker not to report to E.A. any information about mother if that information could "hurt her." Father also requested that E.A. leave the courtroom when there was any discussion of mother.

Although E.A. had limited personal contact with her father, she had telephonic visits with him. Early in the proceedings, E.A. indicated that she wanted to remain at Rita's home but, subsequently, she told the social worker on several occasions that she would like to go to Palestine to be with her father and brother.

Additionally, both the maternal grandfather and maternal grandmother asserted that father would be a good parent to E.A. and that she should be placed with him. They confirmed that they would stay in Palestine to help E.A. adjust. Rita and her son, the current caretakers of E.A., also told the social worker that they had been in contact with father and that he had provided excellent support for E.A.

The foregoing evidence amply supported the juvenile court's ruling. Mother does not argue that the evidence demonstrates that father would not be a good father but claims that the inadequate investigation of father's home in Palestine established clear and convincing evidence of detriment. She maintains that the investigation by the agency

21

did not comply with the social study report requirements as set forth in sections 16501.1 and section 358.1. (See also Cal. Rules of Court, rule 5.690(a) [petitioner must prepare a social study of child, which includes a discussion of all matters relevant to disposition].)

" 'The [a]gency has a duty to apprise the court of all relevant facts and circumstances when issuing reports. [Citations.] "At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court. [Citations.] In this role, the social services agency acts as an impartial arm of the court in assisting the court to carry out the Juvenile Court Law." [Citations.] 'The duties to furnish child welfare services and to provide reports and recommendations to the juvenile court are actually placed by statute upon "the social worker." ' [Citation.]" (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1011-1012.) Here, the record demonstrates that the agency prepared a disposition report and satisfied its duties under the statutes.

Sections 358.1 and 16501.1 do not support mother's argument that the investigation was inadequate. Section 358.1 simply sets forth the "factual discussion" that must be in each social study or evaluation made by the social worker. Here, there is no allegation that the social worker did not have a plan required by section 358.1, and this section does not require any more information than was provided by Adalat. As courts have recognized, section 16501.1 does not create any mandatory duty. Section 16501.1 contains a recitation of the Legislature's findings and a declaration of the goals and purpose of case plans for children involved in dependency proceedings. Where an out-of-home placement is necessary, this statute provides that selection of the placement must be evaluated according to stated criteria, and must be based on an order of priority that puts relatives above foster families. (§ 16501.1, subd. (c)(1).) The statute is merely declaratory of the Legislature's goals for dependent children and "creates no mandatory duties." (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 641; see also *Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1460.)

Mother argues that the record demonstrates that the agency did not carry out its duty because it did not investigate whether a home study could be done of father's home

22

in Palestine. Mother contends that Adalat was under the impression that no home check could be conducted but the record does not show that Adalat attempted to contact Israeli authorities or the Palestinian authority to confirm that no welfare check could be conducted.[5] She stresses that both her attorney and E.A.'s counsel requested a home visit prior to placing E.A. with father in Palestine. She emphasizes that Adalat, the social worker, conceded that father's home would have been investigated had father lived in this country. Mother contends that the social worker improperly delegated the responsibility of investigation to the father seeking custody. (See *In re John M., supra,* 141 Cal.App.4th 1564.)

Mother maintains that the record demonstrates that a home study was especially important in the present case. She stresses that E.A. was being placed in a region where there is a war, E.A. has special education needs and not even father was certain that the school in Palestine would meet her needs, and E.A. did not speak Arabic. Additionally, mother stated that she had "experienced severe oppression while in the Middle East" and she also told the social worker that her "partner" also had a drinking problem. There was also, mother insists, an inadequate investigation of the other people in the household as there was an incident with the maternal grandfather where he pushed mother away from E.A. and mother called the police. There was no investigation into father's new wife.

Mother does not cite any authority that requires a home study before placing a child in the nonoffending parent's home. When placement is with a parent, "the appropriate investigation is a basic one, less rigorous than the investigation necessary for placement with a more distant relative such as a cousin." (*In re John M., supra,* 141 Cal.App.4th at p. 1573.)

Contrary to mother's argument, the agency did not simply accept father's statements about the home situation in Palestine. Adalat did not personally visit the school E.A. would be attending in Palestine but she reviewed the information about it on

---

[5] Mother cites to judicially noticed documents that show that Israel is a signatory to the Hague Convention on Child Abduction and that Israel has a child welfare system with welfare officers.

its web site. She did not have any obligation to contact authorities in Palestine or Israel to do a welfare check on father's home when the evidence in the record showed that father's home was safe and that he was committed to ensuring that E.A.'s needs would be met. Rather than simply relying on father's statements, the social worker confirmed her impressions of father and the veracity of father's statements with the maternal grandmother, maternal grandfather, and Rita. The maternal grandmother had been to Palestine and both she and the maternal grandfather, who was in Palestine during part of the proceedings, assured Adalat that the schools were good and father's home would be good for E.A. Adalat explained that she felt the most reassured by the maternal grandmother's statements since she was not Palestinian.

The record also contained sufficient evidence to support the juvenile court's conclusion that E.A. would be safe in Palestine. Mother argues that the area is "war-torn" but cites no evidence showing that E.A.'s welfare would be seriously jeopardized if she were living with her father and twin brother in Palestine. There is no evidence that her twin brother, who is currently living with father, is in danger. Furthermore, maternal grandmother insisted that there was not a safety problem where father lived and, although there are cultural differences, women are respected. Mother did state that she experienced oppression in Palestine but, at one point during the dependency proceedings, she favored placing E.A. with father in Palestine and believed such a placement would be beneficial for E.A. On August 23, 2012, mother told the social worker that she wanted E.A. back but less than one week later, on August 29, mother told the social worker that she wanted E.A. "to go with her father in Palestine. I think that this is what would be best for her. He will take good care of her and she will be with her brother." At the hearing on September 20, 2012, when discussing the placement of E.A., mother's counsel stated that the last time she spoke to mother "she was in agreement with father's request" to have E.A. placed with him.

Mother's stated reason for contesting the placement of E.A. with father in Palestine was not related to any perceived detriment or danger to E.A. She opposed the placement because mother originally was also going to go to Palestine but when she

decided not to go or she learned that she could not go, she did not want E.A. to go. When asked on October 10, 2012, by the social worker whether she still wanted E.A. to return to her father in Palestine, she responded: " 'No, not anymore. I was planning on going there, but now, I am not going to go, so I don't want her to go either. . . . If she leaves the country, I will never see my daughter again. I can't go unless I finish up everything that is going on here. If she is here, at least I can see her once a week. I want her to know that I am her mother.' "

Thus, the evidence supported a conclusion that mother was not worried about E.A.'s welfare or safety in Palestine. The record also supported the juvenile court's finding that E.A.'s home in Palestine was safe. There was no evidence in the record, other than mother's one statement that her "partner" had a drinking problem, to indicate that father had a substance abuse problem or that his home would be unsafe. As already noted, the statements of the Rita and her son about their interactions with father, the separate declarations of the maternal grandparents, and the promises and actions of father demonstrated father's concern for E.A.'s needs and confirmed that he had the resources to provide her a home that would meet her needs.

Finally, mother argues that the record did not demonstrate that E.A. could become a permanent resident of Palestine. She cites cases that show that sovereign nations require approval for entry. We took judicial notice of the documents submitted by mother that show that Israel must approve in advance any request for permanent residency. She argues that the juvenile court did not have sufficient evidence that E.A. could become a permanent resident.

Mother's "evidence" is insufficient. It does not show that E.A. will not be able to enter Palestine and it does not show that children of Palestinians have any difficulty joining their parents in Palestine. The record is completely devoid of any evidence that E.A. will not be able to emigrate or that she will not be able to become a permanent resident.

We conclude that the record shows that the juvenile court made a reasonable determination that the agency's investigation into father's situation was sufficient to

25

determine that E.A.'s safety and welfare in father's custody in Palestine could be assured. Mother has not cited to any law that requires a more thorough investigation of father than the investigation done. The investigation revealed that E.A. would have a home in Palestine where she would have her own bedroom and would be living with her father, twin brother, and other relatives. Her maternal grandmother and maternal grandfather, with whom she had a relationship, would be there to help her adjust. Her father indicated that he would make sure that her schooling was adequate and that she would receive a therapist or other personal assistance if necessary. The court found father to be credible and the record supported this determination as he complied with all of the agency's requests and exhibited a commitment to E.A.'s best interests. We agree with the juvenile court's finding that the argument that jurisdiction should not be terminated and placement postponed until further investigation can be conducted because Palestine or father's home might not be safe is based on speculation, not evidence.

Accordingly, we conclude that the record supported the finding of no detriment and the court did not abuse its discretion in terminating jurisdiction and placing E.A. with father.

### III. *Denial of Mother's Request for a Continuance*

Mother contends the juvenile court abused its discretion when it denied her request for a continuance of the jurisdictional/dispositional hearing. At the hearing on October 19, 2012, there was a conference prior to going on the record where mother requested a continuance based on the "late notice of the agency's change in position . . . ."

Continuances in juvenile proceedings are disfavored. (See *In re Axsana S.* (2000) 78 Cal.App.4th 262, 272, disapproved on another ground in *In re Jesusa V.* (2004) 32 Cal.4th 588, 624, fn. 12.) When considering a request for a continuance, the juvenile court must give substantial weight to the child's need for prompt resolution, the need to provide the child with a stable environment and the damage to the child resulting from prolonged temporary placement. (§ 352, subd. (a).) Further, "[c]ontinuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance."

26

(§ 352, subd. (a).)  The standard of review on appeal of a denial of a continuance is abuse of discretion.  (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.)

In its second addendum report filed on September 19, 2012, the agency recommended that E.A. be declared a dependent of the court and that reunification services should be offered to both mother and father.  On October 17, 2012, the agency filed its report and changed its recommendation.  It recommended that the court terminate dependency jurisdiction and give legal and physical custody of E.A. solely to father.  The court held the jurisdictional/dispositional hearing two days later on October 19.

Counsel for mother requested a continuance because of the late notice of the agency's change in position.  The juvenile court denied this request, and mother claims the denial of this request constituted structural error.  Alternatively, she maintains that the denial was an abuse of discretion.

Mother's claim of structural error is based on her claim that the agency did not comply with California Rules of Court, rule 5.690(a)(2).  This rule states that the agency "must submit the social study and copies of it to the clerk at least 48 hours before the disposition hearing is set to begin . . . .  A continuance within statutory time limits must be granted on the request of the party who has not been furnished a copy of the social study in accordance with this rule."  (Cal. Rules of Court, rule 5.690(a)(2).)

The hearing on October 19, 2012, began at 9:00 a.m., and the report was filed on October 17, 2012, at 10:41 a.m.  Mother asserts that the report was thus not filed 48 hours before the disposition hearing.

Mother's counsel did not object in the juvenile court on the basis of the agency's failure to comply with the California Rules of Court.  Her objection was based on the "late notice" of the agency's change of position.  Thus, mother has not preserved an objection based on the violation of the rule for appeal.  Nevertheless, since there is no factual dispute regarding the agency's failure to comply with rule 5.690(a)(2) of the California Rules of Court, we will exercise our discretion and consider the merits of mother's argument.

In support of her argument that the denial of her request for a continuance based on inadequate notice of the agency's report constituted structural error, mother cites *Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535 (*Judith P.*). In *Judith P.,* the parent's attorney received the report on the morning of the section 366.21 hearing and the trial court denied a continuance to permit counsel time to obtain documents countering the facts discussed in the report. (*Judith P.,* at pp. 543-544.) The appellate court, relying heavily on criminal cases, held that the notice requirement of section 366.21, subdivision (c) is mandatory and obligatory and that a failure to comply with the statute was a violation of the parent's due process rights and per se reversible. (*Judith P.,* at pp. 553-558.)

*Judith P., supra,* 102 Cal.App.4th 535 predates the Supreme Court decisions that have indicated that orders in dependency proceedings are subject to harmless error review. (See *In re James F.* (2008) 42 Cal.4th 901, 915-916; *In re Celine R.* (2003) 31 Cal.4th 45, 59-60.) "These significant differences between criminal proceedings and dependency proceedings provide reason to question whether the structural error doctrine that has been established for certain errors in criminal proceedings should be imported wholesale, or unthinkingly, into the quite different context of dependency cases." (*In re James F.,* at pp. 915-916.) In *In re James F.,* the Supreme Court held that, in the dependency context, "[i]f the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required." (*Id.* at p. 918; see also *In re A.D.* (2011) 196 Cal.App.4th 1319, 1326-1327 [declining to apply structural error analysis to claim of failure to give notice of dependency proceeding]; *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419-1420 [same].)

In the present case, mother submits no argument to suggest how the agency's filing of the report at 10:41 a.m. on October 17, 2012, rather than at 9:00 a.m., impacted the results. As already discussed, mother's trial counsel did not object on the basis of noncompliance with California Rules of Court, rule 5.690(a)(2), and thus she presented no argument as to how the agency's filing the report one hour and 41 minutes earlier would have benefitted her. On appeal, mother never addresses this issue.

Rather than explain how the agency's filing of the report one hour and 41 minutes earlier would have made any difference, mother objects to learning just two days before the hearing that the agency had changed its recommendation for dependency jurisdiction to a recommendation to terminate jurisdiction and place E.A. with father. This short notice, according to mother, deprived her of the opportunity to investigate father's home and the special educational services available to E.A. in Palestine. Mother, however, does not set forth what evidence she expected to garner.

Mother's argument in the trial court and on appeal does not show good cause to support a continuance. Mother may have received late notice of the agency's decision but she had plenty of notice that the agency was considering whether it should place E.A. with father. On August 29, 2012, mother stated that it would be best if E.A. were placed with father in Palestine and the agency's report filed on August 31, 2012, was clear that father wanted E.A. to live with him and E.A.'s twin brother in Palestine. Moreover, at the hearing on September 20, 2012, counsel for father stated that the primary issue was placement of E.A. and that father was going to contest disposition. Counsel for mother stated that as of the last time she spoke to mother, mother agreed that E.A. should be placed with father. By the end of August 2012, mother knew that the primary issue to be determined was E.A.'s placement and whether she would be placed with father in Palestine. She therefore had sufficient time to investigate father's home by the hearing on October 19, 2012, or to explain precisely what further information she expected to acquire.

Furthermore, even if the court abused its discretion in refusing to continue the hearing, mother cannot demonstrate prejudice. Showing an abuse of discretion is not enough; mother must show prejudice. (See *In re Angela R.* (1989) 212 Cal.App.3d 257, 265.) Thus, mother must demonstrate the result of the continued hearing would have changed in the absence of error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The record in this case is clear that any error in denying the continuance was harmless under *People v. Watson, supra,* 46 Cal.2d 818, as a continuance would not have resulted in a different dispositional order. On October 26, 2012, the juvenile court held a

hearing on mother's motion for reconsideration.  Mother offered no new information about E.A.'s placement with father.  The agency, however, submitted its report indicating that mother had missed two supervised visits with E.A. and had refused to participate in testing.  The maternal grandmother told the social worker that she was moving to Palestine to help with E.A.'s transition.  She reported that she believed father would be "the best father" and that E.A. was "very happy and excited about going to Palestine."

At the end of the hearing, the juvenile court stated:  "[I]n my view there is no new evidence to the mother's benefit that would cause me to want to change my order.  But even if I could completely reopen the hearing and take in all the evidence, including what is known now about the maternal grandmother, mother's refusal to test, mother's missing visits, it is very clear to me that the best interest of this child would be to be with the father."

Thus, in the present case, mother had an opportunity to present additional evidence or a new theory, and failed to do so.  Even if the court should have granted the continuance, mother has completely failed to establish that the denial of her request resulted in any prejudice to her.

## IV.  *The Delay in Moving E.A. to Palestine*

Mother argues that the juvenile court abused its discretion in ordering E.A. transferred to Palestine without first determining whether E.A. could emigrate to Palestine and whether she could become a permanent resident.  This argument, although under a different heading, is a challenge to the placement of E.A. with father in Palestine.  Mother's focus, here, however, is that the court abused its discretion when terminating dependency jurisdiction and then staying that order because the delay in being able to move E.A. to Palestine is harmful to E.A.

The juvenile court made it clear that it was not terminating dependency jurisdiction until E.A. was transferred to Palestine.  The court stated:  "So what I am going to do, and I may need some help preparing this order, stating it correctly, that we will award custody to the father.  That dependency will be terminated once she's transferred to Palestine.  It's open until then.  And still be the same supervision and the

30

same living situation that she is now." The jurisdictional/dispositional order stated that "this order [is] stayed until child is on the plane to Palestine."

Mother relies on *In re Melvin A.* (2000) 82 Cal.App.4th 1243 to argue that the delay in acquiring the necessary documents and permission to permit E.A. to emigrate places the child in "legal limbo" and therefore the juvenile court abused its discretion in ordering the dependency jurisdiction dismissed upon her transfer. In *In re Melvin A.,* the juvenile court issued an order terminating parental rights under section 366.26 but stayed the order pending completion of an adoptive home study. The home study took eight months and the mother claimed that this delay between the issuance of the stay order and its execution precluded a timely consideration of her appeal and violated her due process right to a speedy trial. (*In re Melvin A.,* at pp. 1247-1248.) The appellate court agreed with mother and observed "that it was error for the trial court to order [the mother's] parental rights terminated but indefinitely stay that order, leaving [the mother] in limbo as to the status of the termination order and her ability to immediately appeal that order. This action by the court was inconsistent with the fundamental policy of dependency law[,] which seeks to resolve cases expeditiously. [Citation.]" (*Id.* at p. 1248.) Although it concluded that the lower court erred in staying the order terminating parental rights pending completion of an adoptive home study, the appellate court held that the error was harmless. (*Id.* at pp. 1246, 1250.)

Preliminarily, we note that, here, mother did not object when the juvenile court announced that the jurisdictional/dispositional order was stayed until E.A. could be transported to Palestine. Thus, she has forfeited any right to challenge it.

To the extent that mother is arguing that the delay in E.A.'s placement with her father raises the same concerns present in *In re Melvin A., supra,* 82 Cal.App.4th 1243, we reject her argument. Mother, unlike the parent in *In re Melvin A.,* has suffered no prejudice as a result of the stay. Indeed, in the present case, mother's opportunity to appeal promptly has not been thwarted, as evidenced by this appeal. Furthermore, this stay is in E.A.'s interest. E.A. is not in limbo; she knows she will be going to Palestine when the immigration process is completed. As already discussed, mother failed to show

a likelihood that E.A. will be unable to relocate to Palestine. While E.A. remains in the United States, the juvenile court will continue to have jurisdiction over E.A. and the agency will supervise her placement in Rita's home.

For the reasons already discussed, the juvenile court did not abuse its discretion in placing E.A. with father. The court properly stayed its order terminating dependency jurisdiction until the necessary documents and approvals are acquired to permit E.A.'s move to Palestine. Mother has not produced any evidence indicating that E.A. will not be able to emigrate or that any request for permanent residency will be denied.

## DISPOSITION

Other than the visitation order, all orders of the juvenile court, including the termination of dependency jurisdiction under section 362.4, the award of legal and physical custody solely to father, and the transfer of the minor to Palestine, are affirmed. The visitation order is reversed and the case is remanded for further proceedings consistent with this opinion.

_____
Lambden, J.

We concur:


_____
Haerle, Acting P.J.


_____
Richman, J.